PAULINE STEERE, Appellant, v. CASWELL PALMER, MARY CLARK, EDNA EVERHEART, DELLA BENTLEY, JAMES BUSH, HULEN H. BUSH, CHARLES BUSH, ROBERT L. PALMER, WALTER J. PALMER, CLARK HOWELL, Public Administrator of Greene County, Missouri, and Administrator of the Estate of CLARENCE PALMER, Deceased, PAULINE STEERE, Administratrix of the Estate of EFFIE STEERE, Deceased, and PAULINE STEERE, Executrix of the Estate of J. W. PALMER, Deceased, Respondents, No. 41219—223 S. W. (2d) 391.

Division One, September 12, 1949.

Rehearing Denied, October 10, 1949.

*Arch A. Johnson* and *Frank B. Williams* for appellant.

666

*Roscoe C. Patterson, Kirby W. Patterson* and *Victor O. Coltrane* for respondents.

 VAN OSDOL, C.—Action for specific performance of an alleged oral contract whereby Clarence Palmer and his sister Leanna (Anna), both now deceased, are alleged to have undertaken to "vest title upon their demise" of all their property (real and personal) in plaintiff, their niece, Pauline Steere, in consideration of services alleged to have been rendered by her to their parents (now deceased) and for services to be rendered by plaintiff to them (Clarence and Leanna) as long as they lived. At the time of his death in 1945, Clarence owned 93 acres of land in Greene County, and some lands in the State of Texas. The defendant-administrator, authorized by appropriate orders of sale, has sold the real property; and there remains in the administrator's hands a balance, after payment of debts, which balance after expenses of administration yet to be deducted will exceed $17,000. (As we understand, it is plaintiff's theory the proceeds of the administrator's sale of the realty should be considered, in equity, in lieu of the realty sold.)

The trial chancellor was of the opinion plaintiff had not proved (by the quality of proof essential to the relief plaintiff seeks) the contract alleged; and the trial chancellor was of the further view plaintiff is barred from maintaining her action because of the doctrine of res judicata and election of remedies. A decree for defendants was entered, and plaintiff has appealed.

Clarence Palmer was born January 26, 1876. He resided (in 1915 and 1916, and until his death) on the 93-acre farm in Greene County. He was survived by no descendants, and no will of Clarence Palmer has been presented for probate. His sister, Leanna (Anna), who was in ill health, had lived with him until her death in 1926. Clarence had married Lulu Winifred Adkins in 1918. They were divorced in 1930. There was also testimony tending to show Lulu Winifred was employed to help in the Palmer home for a period of about two years (since some time in 1916) prior to her marriage to Clarence.

The Palmer home was destroyed by fire December 16, 1945, and the charred body of Clarence was found in the ruins. An autopsy disclosed a bullet had penetrated a vital part of his body. (The record discloses no basis for any inference, or even suspicion, that any of the parties to this action were in any way implicated in causing the death of Clarence.)

According to her petition, plaintiff was born February 17, 1898. As stated, she was the niece of Clarence and Leanna—the daughter of their sister, Effie (Palmer) Steere, now deceased. Plaintiff's mother had lived on the Steere farm, about six miles from the home of Clarence, and, except for some period of time preceding Clarence's marriage, plaintiff seems to have lived with her mother, Effie.

Pauline, as a young girl "growing up," did live in the Palmer home. She went to school at the schoolhouse nearby, but at the Palmer home she would be sweeping the floors, doing the cooking and the laundry, "lots of times." And before the aged Grandma Palmer died (perhaps in 1914) Pauline "waited on her sorta as a kid-nurse would." After Clarence's marriage Pauline "didn't stay there as much as she did beforehand." But, after Clarence was separated from Lulu Winifred, Pauline again rendered great services to Clarence; cooked, baked, canned and brought him fruit, pies, cakes, and other provisions; did his laundry; nursed him in his sickness; treated, and perhaps saved his infected hand—for all of which he was expressly most appreciative. Many witnesses confirm Pauline's rendition of services; and several testified of Clarence's statements of his gratitude to her, and (as examples) his statements, "nobody had done anything for him as much as she had, and that he owed it to her" and "he aimed for Pauline to have what he had."

Was there an oral contract by which Clarence (and his sister) had, in consideration of such services, undertaken to vest his property at his death in Pauline? As we have said, the trial chancellor held adversely to plaintiff; but we must examine the evidence and ourselves determine anew if plaintiff has carried her burden in proving the alleged contract by the quality of proof essential to the relief sought.

■ In endeavoring to invoke the power of a court of equity to decree specific performance of the alleged oral contract, plaintiff is seeking to avail herself of an exception to the applicable sections of the Statute of Frauds (and Wills). Sections 3354 and 520, R. S. 1939, Mo. R. S. A. §§ 3354, 520. The exception is sparingly invoked, and only in instances where the strict letter of the Statute would perpetrate fraud. A rule of many phases governs the action of a court of equity in determining ■ if a given case is within the exception. Like the Statute, the rule safeguards against the perpetration of fraud. The rule (or some of its phases) has been stated in many Missouri cases. See particularly Walker v. Bohannan, 243 Mo. 119

at page 136, 147 S. W. 1024 at pages 1028-1029. See also Russell v. Sharp, 192 Mo. 270, 91 S. W. 134; Forrister v. Sullivan, 231 Mo. 345, 132 S. W. 722; Farina v. Madden, Mo. Sup., 163 S. W. 2d 82; Sulgrove v. Sulgrove, Mo. Sup., 215 S. W. 2d 490; Feiden v. Gibson, Mo. Sup., 218 S. W. 2d 105; Wallace v. Shanks, Admr., et al., Mo. Sup., 221 S. W. 2d 873. *One phase* of the rule *requires the proof of the alleged oral contract must be such as to leave no reasonable doubt in* the mind of the chancellor *that the contract as alleged was in fact made.* Walker v. Bohannan, supra. A plaintiff must prove his case by evidence so clear, cogent and convincing that no reasonable doubt can be entertained. It has been said, ''There must be an absence of doubt or equivocation throughout the whole case in pleadings and proof. From end to end it must be made out beyond a reasonable doubt and the state of the proof must bring the case within the reason of the exception . . . A mere testamentary disposition to devise by will . . . by way of gift or as a reward for services not plainly provoked by and bottomed on the contract in suit, will not take the case out of the statute.'' Forrister v. Sullivan, supra, 231 Mo. at page 374, 132 S. W. at pages 730-731. And see again Wallace v. Shanks, Admr., et al., and other cases supra.

At the outset, and aside from any question relating to the application of the doctrines of *res judicata* and election of remedies, we will summarize plaintiff's claims in former proceedings or actions instituted by her, the statements of which claims were introduced into evidence in the trial of the instant action.

May 11, 1946, plaintiff had filed a demand in the probate court for various items—supplies and produce, money advanced, and the unaccounted for proceeds of decedent's sale of claimant's personalty, in all aggregating $10,035; and for $500 for services and expense in sickness. The claim was dismissed for failure to prosecute July 16, 1946. Theretofore, June 1st, plaintiff had filed an action in the circuit court for specific performance of an alleged contract that plaintiff was to become the sole owner of the property of Clarence for services rendered by plaintiff, she to remain single. Plaintiff dismissed the action, December 12, 1946. The preceding day, December 11th, plaintiff had filed a demand in the probate court, alleging, in the 1st Count, that plaintiff's parents in her infancy contracted with Clarence and Leanna that plaintiff should become a member of the Palmer family and should be the Palmers' heir; that later the Palmers, in consideration of plaintiff's services theretofore rendered and thereafter to be rendered, agreed they would, upon their death, vest title to their property in plaintiff; that Clarence executed a will giving plaintiff his estate, but the will was destroyed by fire; that plaintiff had performed but Clarence had failed to perform; that the realty had been sold by probate court order to pay debts, and there remained $20,000 (the debts having been paid), for which sum plaintiff prayed

judgment as her damages. The 2d Count was in *quantum meruit*, and for some of the various items as stated in the demand of May 11th, supra. The probate court found and rendered judgment for the estate. The case was appealed to the circuit court wherein plaintiff dismissed as to the 2d Count; and, upon trial without a jury, the finding and judgment were for the estate.

The diversity in plaintiff's theories of claim in these several former proceedings and her failure in a former proceeding to state the contract in its essential terms as stated herein tends to show the plaintiff herself, a party to the alleged contract, was uncertain of the contractual obligation (if so, and the terms thereof) which Clarence owed to her. Russell v. Sharp, supra.

A witness for plaintiff testified of conversations tending to establish the alleged express oral contract. The witness went to the Palmer home in 1916 and worked as a seamstress for two weeks. She stated Clarence, Leanna (Anna) and Pauline were then "in the household." At an evening ▇▇▇ meal "Clarence stated that Pauline was to take care of them, Anna and Clarence for their lifetime. . . . And she was to receive what they had left at that time." Anna "agreed to Clarence's statement," and Pauline "said she agreed to take care of them to their end." The sister of this witness also testified that, "about 1915," Clarence had said "that Pauline was to be the sole heir of their estate at their death because of the love and service she had rendered to him and Anna in their lifetime." Pauline (who was present) "had nothing to say."

Another witness testified she, a school teacher in the local school from 1924 to 1926, had boarded at the Palmer home; "after Lulu and Clarence separated (in 1930) I stayed in Clarence's home, and he told me one day when he was sick . . . that if he lived through that he was going to make a will, he hadn't made a will at that time . . . he was going to make a will and see to it that Pauline received everything he had." The next spring the witness asked, " 'Clarence, did you ever get everything all fixed up?' And what I meant was the will of course. And he said, 'Yes, I have got everything fixed the way I want it.' . . . He stated he wanted Pauline to have everything he had . . . In return for her services that she had done for him. She had washed, and she had ironed, and she kept his house; after Lulu left him she (Pauline) went out there every week and cleaned and washed, and if she didn't do the washing there at his house she took it home." Clarence had said, "Pauline is my right-hand-man, she is my everything."

Another witness testified she was at a basket dinner at the schoolhouse near the Palmer farm in the year of "about 1916." Clarence then said "he had a contract made, and also his will, and that he intended for Pauline to have all of his property, and they said 'Well, why?' And he said well, because Pauline had been so good to help

with his mother and to help Miss Anna, and she was also going to take care of him as long as he lived." On another occasion at a card party in the Palmer home "Mr. Palmer spoke up again and he said well, Pauline would be well remembered because he had a contract with her and intended to leave her all his property. And I said, 'Well, why?' And he said well, because Pauline had been so good to him and had waited on his mother and helped his sister and himself and she was going to look after him as long as he lived." And in April, 1943, witness and her husband, who were moving from the State of California (where they had for some years resided) to Oklahoma, were revisiting their old home. As they drove by the Palmer farm, "Mr. Palmer was at the gate . . . we stopped and talked with him . . . I asked Mr. Palmer if he had changed his mind about his will, and he said, 'No, I haven't,' he says, 'Pauline has been helping me all the time and . . . I still intend to keep the contract with her and I have my will made and Pauline is to get my property.' " In her answers to interrogatories propounded to her in April, 1947, this witness did not state Clarence had mentioned a contract; the witness then stated Clarence "always did say he was going to leave her his farm at the time of his death. Every time the services of Pauline were mentioned Mr. Palmer would say, 'Yes, but she will be well repaid, as I intend to leave her my farm.' "

[The witnesses, whose testimony in the trial of the instant action we have examined in the three preceding paragraphs, also testified at the trial in the Circuit Court of Greene County upon appeal of plaintiff's probate court demand, mentioned supra, filed December 11, 1946. The judge who presided in the trial of that cause stated in his finding of facts (which, and the demand and judgment, were introduced into evidence in the trial of the instant case), "No witness says that Clarence, in any of his statements, mentioned a contract with Pauline, or that he intended to leave his property to her because he had promised her he would do so."]

It is seen that, generally, these witnesses, in testifying of the alleged express agreement and of the decedent's declarations tending to show the existence of such agreement, were undertaking to relate conversations, more or less casual, of more than thirty years prior to the trial (in 1948). One of the declarations of decedent, said to have occurred at the gate of the Palmer farm, was so late as 1943. It has been thought testimony of a witness who, after many years, undertakes to recall that which had been said is not of great probative value, especially where the conversation in question was casual and the witness has no especial reason to remember what was said. This is not an imputation such witness has purposed to testify falsely, but is merely a recognition of the fallibility of man's recollection of the actual language used in conversations of long ago. Russell v. Sharp, supra. Conversations relied upon as proof of the contract should not

be too ancient, loose and casual. Russell v. Sharp, supra; Forrister v. Sullivan, supra; Annotation, 69 A. L. R. 14, at page 185.

Lulu Winifred (formerly the wife of Clarence), now remarried and living in Illinois, testified by deposition. The witness said she had never heard of a contract whereby Pauline was to have the Palmer estate for services rendered or to be rendered. She stated that Pauline had not done "anything" for Clarence during the time the witness was married to Clarence; Anna "would be making clothes for her (Pauline) and the sister always helped her (Pauline) in every way that she could. She would give her money, buy her clothes, and things like that. Clarence and his sister helped Pauline." So far as the witness knew, Clarence made no will. "He wasn't a man who would talk about affairs to any one. Never thought he would ever die. There are people like that, you know." But, the witness said, "he did mention once in a while to me he hoped that the farm would go to the heirs . . . because they were all equal to him. . . . There were so many of them." If verity is given to the testimony of this witness, who seems not to have any pecuniary interest in the instant litigation, it is strange, if the alleged contract existed, that she (the wife of Clarence for twelve years) would not have even heard of it.

Plaintiff-appellant relies upon the cases of Ver Standig v. St. Louis Union Trust Co., 344 Mo. 880, 129 S. W. 2d 905; and Powers v. Mercantile-Commerce Bank & Trust Co., Mo. Sup., 217 S. W. 2d 375. In the Ver Standig case this court reversed the trial court's judgment for defendants and remanded the cause with directions. A contract to devise the specific property involved for services to be rendered was clearly established by plaintiff's witnesses who consistently testified of decedent's numerous declarations concerning the alleged contract and its terms, and there was no evidence introduced by defendants tending to contradict or to dispute the plaintiff's evidence as to the contract. It seems defendants did not seriously contest the issue of contract, but were principally relying upon nonperformance or breach by plaintiff, who, this court was of the view, through no fault of his own, was permitted by decedent to but partially perform the services called for by the agreement. In the Powers case the many witnesses for plaintiff testified of statements by defendants' decedent. These statements and the shown surrounding circumstances were an "abundance of evidence" of the existence of the oral contract, and there was meager evidence to the contrary. This court reached the conclusion the evidence of the contract was cogent and convincing, and this court's findings were in accord with those of the trial chancellor.

Having examined the whole record, in the instant case, we are of the opinion plaintiff has failed to prove by evidence so clear, cogent and convincing as to exclude a reasonable doubt the alleged contract

was entered into. Our opinion is in harmony with the finding of the trial chancellor who had the advantage of observing the witnesses and their demeanor.

The judgment should be affirmed.

It is so ordered. *Bradley* and *Dalton, CC.*, concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.