Solomon M. POOLE, Appellant,

v.

Arthur D. CAMPBELL, Trustee for The A. Byron Poole Foundation, a Charitable Trust, and John M. Dalton, Attorney General of the State of Missouri, Respondents.

No. 44724.

Supreme Court of Missouri.
Division No. 2.

March 12, 1956.

Rehearing Denied April 9, 1956.

Leman E. Atherton, Milan, for appellant.

R. M. Gifford, M. E. Montgomery, Milan, John M. Dalton, Atty. Gen., C. B. Burns, Jr,. Asst. Atty. Gen., for respondent.

STORCKMAN, Judge.

This is an action for specific performance of an oral agreement to convey real estate situated in Milan, Missouri, on the west side of the public square and improved with three business buildings. The chancellor's judgment and decree was in favor of the defendants and the plaintiff has appealed.

By their written stipulation the parties agreed: On and prior to April 20, 1933, Joannah Poole owned the premises in question which were encumbered by a mortgage debt of $3,000 which was in default. A foreclosure sale was being advertised for April 21, 1933, in accordance with the terms of the deed of trust.

Joannah Poole was in straightened circumstances and had been trying to make a loan on the premises or to find a buyer for the property. On April 20, 1933, she executed and delivered to A. Byron Poole, her brother-in-law, a warranty deed to the premises for the express consideration of $9,000 and said deed was duly recorded in the recorder's office of Sullivan County. At her direction A. Byron Poole paid the amount due under the note and deed of trust and some other obligations of Joannah Poole and actually paid her the sum of $3,166.13 in cash, which made the total paid to her and for her benefit the sum of $9,000, the consideration expressed in the deed. Joannah Poole died June 18, 1944, leaving as her sole and only heir the plaintiff, Solomon M. Poole. Plaintiff's father, John Poole, a brother of A. Byron, predeceased Joannah. A. Byron Poole remained in possession of the premises from and after April 20, 1933, to the date of his death on March 12, 1948. He made no conveyance during his lifetime and the record title to the premises was in his name at the time of his death. He was 82 years of age at the time of his death and died seized of property valued in excess of $70,000. He left no widow or children or deceased children or other descendants but only nephews and nieces and a brother. The will of A. Byron Poole was admitted to probate on March 22, 1948. Within a year thereafter plaintiff brought suit in two counts. The first was to contest the will of A. Byron Poole and the second was for specific performance. There was a separate trial of Count 1, the will contest, which resulted in a finding that the purported will was the last will and testament of A. Byron Poole and said order and judgment was not appealed. Since the will created a charitable trust known as "The A. Byron Poole Foundation," the attorney general was made a party to the suit. Arthur D. Campbell qualified as trustee and entered upon the discharge of his duties and as such was made a defendant in the case. Mrs. Poole's first name is "Johanna" in the transcript, but her signature on the warranty deed is "Joannah"; she is sometimes referred to in the record as Jo or Jose. A. Byron Poole is often referred to as By.

Count 2 of the fourth amended petition upon which the case was tried, is asserted by plaintiff to be an action solely for the specific performance of an oral contract to convey lands. This remaining count will be referred to as the petition. Paragraph 8 pleaded the alleged contract or contracts between Joannah Poole and A. Byron Poole in the alternative. The second alternative was that "said A. Byron Poole offered to pay her $9,000 for said properties and when the said interest and everything was paid he would return the buildings to plaintiff and keep the expenses out." This alternative was eliminated from the case by the plaintiff's election at the end of plaintiff's case. Plaintiff submitted his case on the first alternative in said paragraph 8, which is: "That on or about the 20th day of April, 1933, the said A. Byron Poole contacted the said Johanna Poole and offered if she would deed him the buildings that he would pay her the sum of $9,000 and as a further inducement to the said Johanna Poole to convey said buildings and property the said A. Byron Poole orally agreed that if the said Johanna Poole would convey said property to him that he would, when he was through with said property, turn the said property to her, the said Johanna Poole, if living, if not to Mac (being the name that this plaintiff is commonly known) or that when he was through with said property he would turn said property to this plaintiff * * *."

Prior to answer defendants by motion sought a dismissal of plaintiff's petition on the ground it failed to state a cause of action. Each of the defendants objected to the introduction of any evidence on the same ground.

The judgment and decree recited that the court found "the issues against the plaintiff, Solomon M. Poole, and in favor of the answering defendants on Count Two of plaintiff's Fourth Amended Petition," and further ordered, adjudged and decreed that "the Trust set out in the Last Will and

Testament of A. Byron Poole, deceased, is in all things confirmed, and that the fee simple title in and to the lands in question * * * is vested in the A. Byron Poole Foundation, a charitable trust, as defined in said Will and subject to the terms and conditions therein set forth."

The plaintiff testified in substance and effect as follows: In the latter part of March or the first part of April when the buildings were being advertised for sale, the plaintiff had a conversation with Martin Wunderlich in the office of Higgins and McDuff. Mr. Wunderlich was a road builder who was keeping company with Jane Poole, a cousin of plaintiff. Those present were Albert Poole, Ralph McDuff, Jack Handy, Martin Wunderlich and the plaintiff. The discussion was with reference to Mr. Wunderlich's buying the buildings. No agreement was reached; Wunderlich said he would like to talk to plaintiff later. The conversation stopped when By Poole came in. On defendant's objection this court ruled that plaintiff was incompetent to testify to any conversation with By Poole, deceased, or any statement made by him in plaintiff's presence. No complaint is made on appeal with respect to such ruling.

John W. Stanley, 84 years old, a brother of Joannah Poole and uncle of the plaintiff, testifying by deposition with respect to a conversation he had with By Poole about 1945, just before leaving Milan for Kansas City, stated: "Just before I left here I was talking to him over there, he asked me what I wanted, and we went around the corner of the building and I said I was going away and just wanted to know —I had heard so much about it—what he was going to do about that, and he said, 'I always was a man of my word; I promised them and I'll do it.' What did he promise? To turn them back to her if she was living, and if not to turn them back to Mac." The witness also testified to a conversation he had with Thee Poole, a brother of By, at the hardware store in By's presence. This exchange was: "Now, Uncle John, you mentioned another conversation in the hardware store? Yes.

About when was that? That was—I don't know—just a little bit after he bought the buildings. Who was present? Thee said— he was present—Thee said to me, 'John, I guess By has got all the money he wants. I offered him a thousand dollars for his bargain and he said he couldn't sell it.' By didn't say nothing. I said 'Why couldn't he sell it?' Thee said, 'He said he had a contract he couldn't sell it.' " The witness testified that By Poole was an honest man and always did what he agreed. He had never seen a written contract of any such agreement.

John F. Handy, a resident of Milan thirty years, testified that he was present in Ralph McDuff's office when the buildings on the west side of the square were discussed. The witness, a superintendent for Martin Wunderlich, could not fix the time of the meeting but thought it might have been in the late summer or early fall a couple of years after he came to Milan in 1930. Those present in addition to the witness were Martin Wunderlich, Ralph McDuff, Mac Poole and Jane Poole. By Poole came in later. Wunderlich's purpose in being there was "to put up some money to release a mortgage that was on some buildings of Mac Poole." Witness Handy testified that By Poole said "if they would let him put up the money and take the buildings, when the interest and everything was paid, he would return the buildings to Mac and keep the expenses out." After this statement was made Wunderlich and the witness went back to his home.

T. S. Poole, sometimes called Thee, 88 years of age, an older brother of By Poole, testifying by deposition with respect to a conversation he had with By a day or two after By bought the buildings, stated: "I said, 'By, you got a bargain; how much will you take for your bargain?' He says, 'Why, I can't sell that building, them buildings.' Did he tell you why he couldn't sell the buildings? Yes, he said he bought—I believe the deed was in Jo's name—he said he had promised Jo, he had went down and seen her and promised her if she would sell him those buildings and pay the mortgage off, when he got through with them he

would turn them back to Mac. And he at that time refused to sell the buildings to you? Yes, said he couldn't sell them." The witness said he had intended to be a bidder at the foreclosure sale and "I would have made them bring $13,000 easy." In his opinion the reasonable market value of the buildings in 1933 was "at least $14,000 or $15,000." Witness Thee Poole testified that Mac and his mother inherited $40,000 in government bonds and he didn't know what else from John Poole, and that he expected that part of what Mac inherited "went down his neck."

Alfred R. Poole, 46 years old, a son of Dr. A. R. Poole whose nickname was Black, and a nephew of By Poole, testified that he saw Martin Wunderlich in the hardware store with his sister Jane about the middle of April, 1933. The next morning By Poole came into the store and said that he bought the buildings off of Jo Poole, but that he couldn't buy them outright. He said further, "I believe it will be better for Mac, he might open up his mind if I gave them back to him. I am obliged to give him back those buildings, him or his mother one." Later the witness' father and brother came in and By said, "Well, Black, I saved the buildings." By then offered to sell the buildings to the witness and his brother for $9,000 with interest at six per cent and an equal amount of insurance on the buildings "but I want you to know when I am done with those buildings, those buildings go back to Mac and his mother, that you boys can't sell them." The offer was not accepted by the boys. On another occasion By came into the store and told Black Poole that he had a chance to sell the buildings to Harry Payne and that he wished people would let him alone because "I can't sell them, they go back to Mac and Jo." On cross-examination the witness testified that he and his brother didn't have any money to buy the buildings, but that By was going to loan them the money to buy the buildings from him.

Harry Payne, a resident of Milan all his life, testified that in 1933 he talked with By Poole about the buildings and asked him if he would sell, and By Poole told him that he wouldn't sell the buildings because he promised Jo that when he was through with them "I intend for her to have them and if she should die before I do Mac will get them." Witness Payne further testified that sometime after that By Poole was making a new will and had Ralph McDuff read the paragraph wherein it provided that when By Poole was through with them Jo was to get the buildings back. The witness saw that part of it but Ralph read the entire will. The witness testified that the reasonable value of the buildings in 1933 was twelve to thirteen thousand dollars.

A number of witnesses, testifying about the trend in real estate values between 1926, when Joannah Poole acquired the buildings, and 1933 when they were sold to By Poole, generally gave as their opinions that the value of real estate was down twenty-five per cent or more.

On behalf of the defendant, O. H. Gramling testified the reasonable value of the three buildings in 1933 was somewhere between nine and ten thousand dollars as also did Frank Railing, John Lee and N. A. Mewmaw. Charles S. Dickson put the value at eight to ten thousand. Arthur D. Campbell estimated their reasonable value in 1933 to be seven, eight or nine thousand dollars.

L. C. Hoover, the holder of the three thousand dollar note and deed of trust on the property, testified that while the loan payments were in default the plaintiff offered to deed the property to the witness Hoover if he would take it over and pay the back taxes and give the plaintiff a thousand dollars. Mr. Hoover didn't do this because, as he stated, "the money was pretty scarce and I had my farm out there, I just didn't have the money to swing it I didn't think." The note was later paid by By Poole. The witness had conversations with By Poole but never heard him make any statement that he was going to give the buildings to Mac or that they were Mac's buildings for his mother.

Arthur D. Campbell testified that he tried to get a new loan in the spring of 1933 to replace the Hoover loan on the buildings,

but was unable to do so "partly because the lending agencies were just out of business." During his quest he talked to By Poole and others. The rental income of the buildings was about $225 per month. Mrs. Joannah Poole purchased the buildings July 16, 1926, for a recited consideration of $13,500.

The foregoing resume of the evidence bearing on the alleged contract and its terms is stated as favorably to plaintiff as can reasonably be done.

Plaintiff's petition does not allege any facts upon which a charge of fraud can be predicated. In his brief, however, he contends that proof of consideration was unnecessary because Byron Poole worked a fraud on Joannah Poole in that he caused her to relax her efforts to raise money by stating in the presence of Martin Wunderlich that he, Poole, "would put up the money." The Wunderlich episode adds nothing to plaintiff's case. The owner, Joannah, was not present and there is no showing that the matter was ever communicated to her. The plaintiff was not shown to be her agent and, in fact, during the trial plaintiff made objections to the admission of evidence on the ground that there was no proof that plaintiff was his mother's agent. Nor is there any proof that Wunderlich's presence in Milan offered any hope of relief for Mrs. Poole's financial distress. His visit was as consistent with a social purpose as any other.

Again in his brief the plaintiff urges that "the failure of A. Byron Poole to carry out the agreement was a fraud such as this court will relieve." A breach of an oral agreement to convey land does not in and of itself constitute a fraud. Because of plaintiff's failure to plead and prove fraud there is no such issue before us on appeal. Gates Hotel Co. v. C. R. H. Davis Real Estate Co., 331 Mo. 94, 52 S.W.2d 1011, 1015 [7]; Parker v. Blakeley, 338 Mo. 1189, 93 S.W.2d 981, 991; Long v. Conrad, Mo., 42 S.W.2d 357, 361. Several of plaintiff's witnesses voluntarily testified that Byron Poole was a man of honesty and integrity; and there is no proof that he acted fraudulently in this particular instance.

Being a suit "for the specific performance of an oral contract to convey lands," the case is within the purview of the statute of frauds. Section 432.010 RS Mo 1949, V.A.M.S. Our inquiry, therefore, shall be directed to whether a contract has been suitably proved and, if so, whether there is evidence of performance that will satisfy the equitable standards for relief as an exception to the statute.

This type of case is of fairly frequent occurrence and the rules for our guidance have become quite well defined and accepted. The applicable rules and the reasons therefor are so well stated in Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024, loc. cit. 1028–1029, that, at the expense of brevity, we will repeat them here:

"The enforcement of contracts of the character here involved is an exception which courts of equity have ingrafted upon the statutes of frauds. The exception is one that is sparingly exercised, and rightfully so. Title to real estate should not slumber in oral contracts to convey. The very conscience of the court must be touched by the facts of the particular case before the exception to the statute will be called into play. * * * With the acquired experience the courts had gained before the passage of the original statutes of frauds and perjuries, they were slow to ingraft thereon any exception to the iron-clad rule of the statute. Later, however it became apparent to courts of conscience that frauds were being perpetrated under the strict letter of the statute. To obviate these frauds, the exception to the statute here invoked was adopted by courts of equity, but not without well-defined rules of procedure—rules, which like the statute itself, would be a safeguard as against the perpetration of frauds. The rules cover many phases; i. e., (1) the alleged oral contract must be clear, explicit, and definite; (2) it must be proven as pleaded; (3) such contract cannot be established by conversations either too ancient on the one hand, or too loose or casual upon the other; (4)

the alleged oral contract must itself be fair, and not unconscionable; (5) the proof of the contract as pleaded must be such as to leave no reasonable doubt in the mind of the chancellor that the contract as alleged was in fact made, and that the full performance, so far as lies in the hands of the parties to perform, has been had; (6) and the work constituting performance must be such as is referable solely to the contract sought to be enforced and not such as might be reasonably referable to some other and different contract; (7) the contract must be one based upon an adequate and legal consideration, so that its performance upon the one hand, but not upon the other, would bespeak an unconscionable advantage and wrong, demanding in good conscience relief in equity; (8) proof of mere disposition to devise by will or convey by deed by way of gift, or as a reward for services, is not sufficient, but there must be shown a real contract to devise by will or convey by deed made before the acts of performance relied upon were had. There may be other phases of the rule adhered to by the courts in cases of this character, but the foregoing are clearly within a long line of Missouri cases. * . * * Suffice it to say that they all indicate that the courts are slow to enforce contracts of the character we have here. It is only where the very justice of the thing is so clear that the refusal of relief would itself amount to a deep-seated wrong and fraud upon the party that courts of equity will act, and, as said before, this is right. The fickleness of land titles should be averted. The wholesale enforcement of such contracts would bring more absolute wrongs than the absolute denial of relief in all such cases. It should therefore be with discerning eye and ear that the chancellor appealed to should proceed. His single purpose should be the prevention of a real fraud, rather than an imaginary one. His decree should protect substance, rather than shadow, and the evidence to support his decree

should point to a real and actual fraud as the outgrowth of a failure to enforce a clear, certain, reasonable, and specific contract. By this we mean a contract between the parties, not a contract made for the parties by loose declarations gathered together after death has sealed the lips."

The rules are necessarily strict and the attitude of the courts generally is that they should not be liberalized and there should be no further encroachment on the statute. Steere v. Palmer, 359 Mo. 664, 223 S.W.2d 391, 392–393; Forrister v. Sullivan, 231 Mo. 345, 132 S.W. 722, 731.

Plaintiff depends upon the oral admissions of By Poole not only for proof that there was a contract but for its terms as well. No other fact or circumstance supports the contention since we are persuaded that the price of $9,000 which Byron Poole paid for the property was fair and reasonable under the conditions then existing. In 1933 during the depth of the great economic depression real estate generally sold for less than before or after that period. If we were to give such fact the significance for which plaintiff contends, practically all real estate transfers during that time would be in jeopardy.

Verbal admissions ought to be received with great caution, especially since their repetition is subject to the chance of errors and mistakes in hearing, comprehending and restating. Ferguson v. Robinson, 258 Mo. 113, 167 S.W. 447, 454. The witnesses testifying to the admissions were not without interest. They were either relatives of By Poole who had been parties to the will contest or were witnesses for the plaintiffs at the trial of the will contest.

The admissions in evidence tending to prove that By Poole could not purchase the property without making a contract to reconvey seems inconsistent with other testimony in the case and out of harmony with conditions generally prevailing at the time. Admittedly Joannah Poole was in straightened circumstances. The loan for which

the buildings were security was past due and the property was advertised to be sold. Mrs. Poole had been unable to refinance the property or find a buyer. Obviously she was in no position to require the purchaser to agree to unusual and onerous conditions. We are impressed with the uncontradicted testimony of L. C. Hoover. He testified that the plaintiff offered to transfer the property to him, the mortgagee, if he would pay the taxes and, in addition, the sum of $1,000 to plaintiff and his mother. His recollection is more likely to be correct because his financial interests were involved; his talk with the plaintiff was not loose or casual. His refusal to accept this attractive offer is typical of the caution and fears of those times. There is no showing that anyone offered Joannah Poole as good or a better deal than she received from By Poole. The testimony of Thee Poole that he intended to bid on the property and would have made it bring at least $13,000 is unrealistic and not in keeping with the financial conditions of the times and other evidence in the case.

■ The petition states that the purpose of the conveyance by Joannah to Byron "was merely to place the title to said premises in A. Byron Poole until he was through with them." There is no further explanation, either in the pleadings or proof, of the exact nature of the contract or its terms. In comparable situations it has been held that the terms of an oral agreement must be proven as definitely as if it were in writing. The facts to be proven are alike in each case although the nature of the evidence is different. Ferguson v. Robinson, 258 Mo. 113, 167 S.W. 447, 453.

■ The pleadings and proof offends controlling rules of law in several respects. First, the courts will not make a contract for the parties, supplying missing terms if necessary, and then undertake to enforce the contract by specific performance. P. R. T. Investment Corp. v. Ranft, 363 Mo. 522, 252 S.W.2d 315, 316. What we have said also applies to the proof of performance that is necessary to take the contract from under the operation of the statute of frauds.

Such performance must be unequivocal and the acts relied on to show it must in their nature be referable alone to the very contract sought to be performed. Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024, 1028–1029. The performance pleaded was that "Joannah Poole by executing the warranty deed aforesaid fully performed her part of said agreement." It cannot be said that the execution and delivery of the warranty deed by Joannah Poole was referable only to the oral contract to convey. More properly it is referable to the outright sale of the property to Byron Poole, which required the execution and delivery of the warranty deed. The deed of conveyance which is in evidence and before the court contains no exceptions. It is in the usual form of an unrestricted conveyance by warranty deed. This and the will by which Byron Poole devised the property otherwise than to the plaintiff is strong evidence that Byron Poole did not consider himself to be bound by a contract to reconvey.

■ Judged by established standards we cannot say that the plaintiff has proved his case by clear, cogent and convincing evidence so as to remove all reasonable doubt. The doubt left by the pleadings has not been removed by the evidence. Steere v. Palmer, 359 Mo. 664, 223 S.W.2d 391; White v. Cochran, Mo., 248 S.W.2d 854, 856; Sulgrove v. Sulgrove, Mo., 215 S.W.2d 490, 492. In reaching our conclusion we have reviewed the record and weighed the evidence deferring where proper to the findings of the chancellor. Jones v. Linder, Mo., 247 S.W.2d 817, 819; Roberts v. Clevenger, Mo., 225 S.W.2d 728, 729; White v. Cochran, Mo., 248 S.W.2d 854, 856.

■ This case has been well briefed on both sides and there appears to be no substantial disagreement as to the controlling rules of decision. The difficulty lies in the evaluation of the evidence. Plaintiff states and stresses that the admissions of Byron Poole were proven by five uncontradicted witnesses. The fact that the witnesses were not contradicted is of course

not decisive. The case of Sulgrove v. Sulgrove, Mo., 215 S.W.2d 490, cited by plaintiff, was decided for the defendant both in the trial court and on appeal although the defendant offered no witnesses. Also cited were Thompson v. St. Louis Union Trust Co., 363 Mo. 667, 253 S.W.2d 116, and Plemmons v. Pemberton, 346 Mo. 45, 139 S.W.2d 910, in which cases the evidence was held to be free from doubt and specific performance was declared. The nature of the contracts, the quality of proof and other circumstances in evidence account for the different results in those cases. We have thoroughly considered all of plaintiff's cases and his arguments. It would extend this opinion unduly to undertake to discuss them all. On the whole record the evidence is insufficient to justify a decree of specific performance of an oral contract to convey land.

The judgment should be affirmed and it is so ordered.

All concur.