George TREON, Appellant,

v.

Dr. Kenneth COFFELT and Dr. Curtis Epps, Trustees under Will of Ada L. Morelock, deceased, Wayne T. Walker and W. Ray Daniel, Executors of Will of Ada L. Morelock, deceased, and Burge Hospital, Respondents.

No. 47421.

Supreme Court of Missouri,

Division No. 2.

April 11, 1960.

Farrington & Curtis, E. C. Curtis, Thomas Strong, Springfield, for appellant.

C. Wallace Walter, Buell F. Weathers, Mann, Walter, Powell, Burkart & Weathers, Springfield, for respondents, Dr. Kenneth Coffelt, surviving trustee, and Burge Hospital.

JAMES W. BROADDUS, Special Judge.

This is an action for specific performance of an oral agreement to devise to the plaintiff a 3-acre tract of real estate. The trial court denied relief and plaintiff appealed.

Plaintiff's petition alleges that on or about October 26, 1946, plaintiff and one Ada Morelock entered into an oral agreement, by the terms of which plaintiff agreed to care for the said Ada Morelock for the remainder of her life, furnishing her such financial assistance and personal care and attention as she might need and request, including one-half of the annual proceeds of a bait hatchery being operated by plaintiff in Christian County, Missouri, and that in return the said Ada Morelock agreed to devise to plaintiff the real estate described in plaintiff's petition and located on Glenstone Avenue, Springfield, Missouri. The petition alleges full performance of the agreement upon the part of plaintiff; that the said Ada Morelock, in keeping with the agreement, executed a will devising the property to plaintiff, but that shortly before her death she destroyed that will and executed a new will devising the property to defendant Burge Hospital, thereby breaching her contract with plaintiff.

The testimony showed that at the date of the alleged agreement, Ada Morelock was 62 years old. She lived at 2227 Glenstone in Springfield. Plaintiff moved to the Morelock home as a roomer and boarder, 25 to 30 years ago. During the period of time he lived there, plaintiff was working nights and wanted something to do in the daytime, so he began selling minnows he seined from a creek and placed in a goldfish pond on the Morelock property. Mrs. Morelock helped get the business started. The minnow business grew, and pools were built in the back yard. As the minnow business grew, Mrs. Morelock began working with plaintiff and spent more and more time working at the minnow business. They worked together for several years and divided the profits of the business. In addition to the retail bait business on Glenstone, there was a bait hatchery in Christian County near Ozark located on a 40-acre tract purchased by plaintiff in 1941.

In October 1946, Mrs. Morelock became ill and upon advice of her doctor, the minnow pools and bait business at her residence were closed and were never reopened. There was testimony that she did some work at the bait hatchery near Ozark after that date, perhaps up to 1948, 1949 or 1950. Her letter dated February 17, 1954 stated that she quit work eight and one-half years before. There was other testimony that

she tried to work in 1947, but had to give it up because her health would not permit her to continue. Mrs. Morelock lived until December 17, 1956, but she was in ill health during all the period from 1946 until her death. She suffered from dropsy and leukemia. Her expense for medicine was from $60 to $80 per month for several years. She was hospitalized every two or three months for periods of about three weeks. The longest she was ever out of the hospital was in 1954 when she was out for five months. Each time she was hospitalized her bill, not including the doctor, was $500 to $575. On two occasions plaintiff took her to a hospital in St. Louis where she stayed for several days, remaining the second time more than two weeks. According to three witnesses Mrs. Morelock kept money in tin cans in the home, from $1,000 to $2,500 in a can. The money totaled $2,000 to $5,000. She also kept money in two billfolds. All of this money came from plaintiff. She paid her bills from the money in the cans, first transferring small amounts to her billfolds.

Mrs. Morelock kept her own books and kept close account of the medicines, treatments and expenses when she was in the hospital, but she was not able to keep all of the books during all of the years after 1946. She was prompt in the payment of her bills up to the last three or four weeks of her life, and in June 1956, Mrs. Morelock was paying her bills and was as mentally alert as before. Plaintiff was quoted by one of the witnesses as saying that she was a good business woman and that if it had not been for her, he wouldn't have what he did have. At one time when Mrs. Morelock was ill, plaintiff stated that all he had he owed to the Morelocks. He was greatly concerned about her illness.

Mrs. Morelock executed a will in 1951 in which she left the property on Glenstone to plaintiff. She executed another will in 1953 also leaving it to plaintiff. She made a third will on July 31, 1956, less than five months before her death and left plaintiff $1,000 and certain furniture, later appraised at $351. By this will she directed the sale of the Glenstone property and bequeathed the proceeds to Dr. Kenneth Coffelt and Dr. Curtis Epps, Trustees, for the use and benefit of Burge Hospital.

The wills were all prepared by the defendant Wayne Walker. In preparing the last will, Mr. Walker discussed the provisions of the will with Mrs. Morelock at her home and used penciled notations prepared by Mrs. Morelock.

In 1954 Mrs. Morelock made a gift to plaintiff of her one-half interest in the Glenstone Bait Co., 2227 Glenstone, Springfield, Missouri, "consisting of good-will, truck, equipment and small minnow stock" and "also any interest of donor in Glenstone Hatchery, Ozark, Missouri." Plaintiff sold the Ozark Hatchery in 1956. It was sold with another hatchery plaintiff owned at West Plains. The combined sale price for the two was $100,000. The sale was all in a combination, with no price set on either property. There may have been some conversation that the West Plains Hatchery was priced at $30,000, and the balance on the Christian County Hatchery.

The will was read at the Morelock home after her death by Mrs. Jennie Oltman and the plaintiff, and later by Mrs. Bessie Hutchinson. Also present at the house were Mr. Walker, his secretary, Jo Ellen Beatty and Paul E. Minick. The value of the Glenstone property was estimated to be $7,000 to $10,000 in 1946 and $60,000 to $65,000 at the time of the trial.

In view of the fact that the law of each case of this nature must arise from its own peculiar facts (Ver Standig v. St. Louis Union Trust Co., 344 Mo. 880, 129 S.W.2d 905, 907) we will set forth the testimony somewhat in detail.

Mrs. Jennie Oltman testified that she had known Mrs. Morelock for 39 years. Mrs. Morelock was her closest friend. They were constant companions and saw or talked to each other daily at all times when Mrs. Oltman was in Springfield. From

May 1951 to September 1952, Mrs. Oltman lived in Texas, but made many trips back to Springfield and saw or talked to Mrs. Morelock daily. Since January 1953, Mrs. Oltman has lived in St. Louis about seven months of the year and in Springfield five months of the year. When she was in St. Louis, she wrote Mrs. Morelock weekly and made frequent trips to Springfield to see Mrs. Morelock, coming every month or every two months. She visited Mrs. Morelock each time she was in the hospital, with only one exception. Mrs. Oltman testified that Mrs. Morelock wanted Mrs. Oltman with her in her last illness, so she came and stayed in Mrs. Morelock's home the last seven and one-half weeks of her life. She stated she was not a friend of the plaintiff.

Mrs. Oltman testified that she was present in Mrs. Morelock's home in October 1946, the day the minnow pools were closed; that Mrs. Morelock had been out of the hospital a few days, and Mrs. Oltman went out to see her; that Mrs. Morelock told her that she had had a long talk with plaintiff that morning and that she had made an agreement with plaintiff and that she was going to give him her home and everything in it at her death. Mrs. Oltman quoted Mrs. Morelock as saying: "Treon has offered to give me half of the profits of the hatchery as long as I live or as long as I need them even though I am not able to work, and in return for this, Oltman, I'm going to give him my home here on Glenstone. He is to take care of me in every way personal and money, and in return I am going to give him my home here on Glenstone. * * * when I die."

Mrs. Oltman said that another time Mrs. Morelock referred to the agreement, saying that when she was gone plaintiff would not have to work so hard and he could live there and open up the pools and have the retail business, and said that on another occasion she again mentioned the agreement stating: "Oltman, Treon has been wonderful. I don't know how I would have lived. I don't know what I would have done

without his financial and personal care that he has given me. You have done so much but Treon has been here. He has been wonderful. He has more than lived up to his agreement." Mrs. Oltman testified that Mrs. Morelock had shown her the first two wills, one in 1951 and the other in 1953. She said that in both of those wills the home place on Glenstone was devised to plaintiff for all he had done according to the agreement. Mrs. Oltman also testified that plaintiff told her that he was "going to file it (suit) on the ground of being Mrs. Morelock's common-law husband, although he did not tell her he was such common-law husband; Mrs. Oltman told Mrs. Bessie Hutchinson that's what plaintiff was going to do. Mrs. Oltman and plaintiff were at the home of Mrs. Dorothy Mason several days after Mrs. Morelock's last will was read. Mrs. Oltman was present when plaintiff told Mrs. Mason, in effect, that he was going to file suit to try to establish a claim against Mrs. Morelock's estate because he had had the same capacity as a husband to decedent. Mrs. Oltman remembered no conversation at that time about any contract. The following morning Mrs. Mason called Mrs. Oltman and said, in effect, "Oltman, you don't mean to tell me that George Treon is going to malign my aunt by claiming to be her common-law husband?"

Robert Schupbach, an auditor for Singer Manufacturing Co., and a former employee of plaintiff, testified that in the years 1953 to 1955, when he was employed by plaintiff, he saw Mrs. Morelock from four to seven times a week. On one of his visits Mrs. Morelock told him that when she died her home was to go to plaintiff; that she had an agreement with plaintiff that he was to provide for her and take care of her as long as she needed it, and he was to receive the place at her death.

John Treon, who is plaintiff's son and only heir, testified that he became acquainted with Mrs. Morelock in June 1946; that he worked at the hatchery from February 1947 until the latter part of June of that

year; that he made quite a few visits to Springfield after 1947, averaging two or three a year, with the exception of 1954; and that on numerous occasions he was around the home when Mrs. Morelock and plaintiff were present. He said in 1946, after the minnow pools were closed, Mrs. Morelock told him that her doctor told her earlier that year that she would not be able to work any longer, and that she and plaintiff had come to an agreement that she would receive one-half of the profits from the hatchery, or any additional money she needed for as long as she needed it; that plaintiff was to take care of her in any way she needed, both physically and monetarily, and that in return she was to leave the home place to plaintiff. John also stated that Mrs. Morelock told him on several occasions that she had left the home place to plaintiff in her will because of the way the agreement had read and she wanted to be sure that it went to him.

Mrs. Billie Marie Johnson, a niece of Mrs. Morelock, testified that she had lived in California since 1942, but had come to Springfield every year to see her mother and Mrs. Morelock, and on each occasion she visited in the home of Mrs. Morelock. She said that in June 1956 Mrs. Morelock told her that she had an agreement or contract with plaintiff, that plaintiff was to provide for her and take care of her for the rest of her days, giving her one-half of the profits from the hatchery, and that in return she would give the home place on Glenstone to plaintiff at her death. She testified that in 1951, while visiting at her aunt's home, Mrs. Morelock told her that she made her will and that the home place was to go to plaintiff. She said that on another occasion in June 1956 she was visiting her aunt; that they were picking raspberries for lunch and that Mrs. Morelock told her again that her will stood just as it did in 1953, and that the reason she wanted plaintiff to have the home place was because of their agreement.

William O. Justice, a real estate agent, testified that in 1955 or 1956, he went to Mrs. Morelock's home on Glenstone to see about listing the property for sale; but that Mrs. Morelock told him that she and plaintiff had an agreement about the property that they wouldn't sell it—didn't want to sell it.

Orran Hassler, a real estate salesman, testified that in the spring of 1956 he went to the home of Mrs. Morelock to try to list the property, but that she refused to list it, telling him that she was under contract with the plaintiff.

Howard Hedgpeth, a motel owner and real estate man, testified that in 1956 he went to the home of Mrs. Morelock to try to list the property for sale. He said she told him that she couldn't sell it, because she was under contract to plaintiff on the property.

William Schaffitzel, the owner of 27 greenhouses, testified that he had known Mrs. Morelock for quite a long time; that in 1956 he called her about some bait; that he knew she was ill so they had a casual conversation and that in the conversation she told him that plaintiff took care of her, both financially and personally, and had looked after her practically as if he had been her own son, and that after she was gone plaintiff would get the property.

Mrs. Caryl Rosenow, an insurance agent at Ozark, who had been acquainted with Mrs. Morelock since about 1947, testified that Mrs. Morelock had stated in a conversation with her that plaintiff was to have the Glenstone property when she was through with it.

John Yunger, a salesman for R. L. Pope Publishers, and formerly in the real estate business, testified that on various occasions during the years 1955 and 1956, he told Mrs. Morelock on the telephone that he was in the real estate business and asked her why she didn't sell her Glenstone property, and said she replied that, "I just cannot sell it because of the understanding and arrangement I have with George Treon."

William G. Clark, an owner and manager of the Kent-Clark Monument Co., and Secretary of the Gate-of-the-Temple Masonic Lodge, testified that he had known Mrs. Morelock since he was a boy; that for the last four years he had visited her at Christmastime and at times when she was in the hospital; that on Christmas Day, 1955, he visited her at her home, delivering a basket of fruit from the Lodge. He stated that during the visit he inquired why she didn't sell her home and get an apartment, and Mrs. Morelock told him that she couldn't sell it, that it was Treon's.

Defendant Wayne T. Walker, an attorney who represented Mrs. Morelock from 1935 until her death, testified that he discussed with Mrs. Morelock in the presence of plaintiff some of the matters pertaining to the Glenstone Bait Co. & Hatchery and the partnership which they were carrying on in the business; that he was present when Mrs. Morelock disposed of her interest therein.

Two or three weeks after the probate of Mrs. Morelock's will, the plaintiff came to Mr. Walker's office. Plaintiff then stated, "I am going to bust that will." When asked on what ground, plaintiff replied, "Well, you may not know it but I was her common-law husband." When the witness stated that it was his understanding that there isn't such thing as a common-law husband in Missouri, plaintiff then threatened to break the will on the ground that Mrs. Morelock was not capable of making a will. Mr. Walker then expressed his opinion that plaintiff would have no legal capacity to contest the will, being unrelated to decedent and not being an heir. Plaintiff then said that he had waited on the decedent the last six weeks of her life, hand and foot, and he could file a claim for that. At no time during the discussion in Mr. Walker's office and at no other time did plaintiff claim that he had any agreement or contract with Mrs. Morelock about what was going to be done with the property on Glenstone. He never heard either plaintiff, Mrs. Morelock or anyone else say anything at any time about any such agreement or contract. His first knowledge that plaintiff was claiming that Mrs. Morelock had made any such agreement or contract was either in conversation with Mr. Curtis or when summons was served, he didn't remember which.

The last will of Mrs. Morelock was read in the home of the decedent in the morning of January 2, 1957. Although plaintiff read the will, he did not indicate any protest or objection at that time. Plaintiff removed the furniture he was receiving under the will from the house. Plaintiff made inquiry about some piece of equipment or furniture, whether it was his or remained with the real estate.

Mr. Walker recalled that he prepared a will for Mrs. Morelock in 1950 or 1951 and another in 1953. He said he did not recall who received the Glenstone property under either of the prior wills, although he admitted that this question was discussed with an attorney and with plaintiff shortly after the death of Mrs. Morelock. He said he did not have copies of those wills in his office; that he had moved his office since 1953 and had destroyed all of the files he thought he would not need.

Mr. Leonard Chinn, an attorney who handles a great deal of tax work, at the request of Mr. Walker went to Burge Hospital in the Spring of 1954 to talk to Mrs. Morelock about a gift. Mr. Walker, Ada L. Morelock and plaintiff were there. They discussed the gift of the interest in the Glenstone Bait Company and the Glenstone Hatchery, having conversation with plaintiff and Mrs. Morelock, and obtained information from which to prepare the gift tax return. He prepared both form 700, the Donor's Return, and form 710, the Donee's Return. Defendants' Exhibit 1 was identified as a copy of the Donee's Return prepared by him and showing a gift to George Treon on 12/31/53 of an "undivided one-half interest in Glenstone Bait Co. and Glenstone Hatchery, including good-will, truck, equipment and minnow

stock," the approximate value at date of gift being $16,500. He also identified Defendants' Exhibit 3 as being a carbon copy of a Gift Tax Return of Donor Ada L. Morelock, which he had prepared in connection with this gift. He recalled hearing no conversation about any kind of an agreement or contract between Mrs. Morelock and plaintiff when he was obtaining information for the preparation of the gift tax return or in talking with them.

Mrs. Bessie Hutchinson testified that on April 15, 1946, she moved to a 4-room house on the Morelock property on Glenstone and lived there until Mrs. Morelock died. She did not know Mrs. Morelock personally when she moved there, but said they later became friends. She said she saw Mrs. Morelock practically every day during that time; that she did not have a TV set and that she went to the Morelock residence about every evening to watch TV; that there was a communication system between her house and the Morelock house which Mrs. Morelock could use to signal her. She said Mrs. Morelock showed her the penciled notations regarding her will and in her presence called Mr. Walker. Later that same day Mrs. Morelock showed her the signed will. Mrs. Morelock never did show her any other wills. Under the last will Mrs. Hutchinson received $1,000 and the one-acre tract on Glenstone where she was living. She was not related to Mrs. Morelock. She did not know about Mrs. Morelock keeping money in tin cans, and did not know whether or not Mrs. Morelock kept two billfolds for her money, but stated that Mrs. Morelock took her into her confidence.

With regard to the contract, Mrs. Hutchinson testified that she did not at any time hear Mrs. Morelock make any statement about any kind of an agreement with plaintiff, referring to what she was going to do in her will. She said she never heard the plaintiff make any statement at any time that there was an agreement or contract with Mrs. Morelock wherein Mrs. Morelock was going to devise the Glenstone

property to him. She admitted on cross-examination that plaintiff did not tell her his personal or business affairs.

Mrs. Hutchinson stated that after Mrs. Morelock's death and before her burial, plaintiff took her to the undertaker's and at that time said he stated that Mrs. Morelock had left him out of the will. She asked him how he knew and he said, "Well, I just know." He made a statement about the furniture and again said he was left out but said, "If that is the way she wants it, that's the way it will be." Mrs. Hutchinson said that when the will was read at the Morelock home, Mrs. Oltman said to her, "Come in, I want you to see this damn will," and plaintiff said to her that, "No woman in her right mind would make a will like that." She said that when the will was read, she did not hear plaintiff say anything about any contract or agreement. She heard Mrs. Morelock and plaintiff discuss income tax returns. Plaintiff always thought Mrs. Morelock turned in too much income for tax purposes. Plaintiff said, "that if he had full control of it he would not turn in," Mrs. Morelock said, "As long as I am in the partnership with you George, it will be turned in right regardless of how you feel about it." Mrs. Morelock sometimes told plaintiff that she didn't think he brought in all the invoices and that she wanted an invoice for every sale. Mrs. Morelock and plaintiff discussed the matter of sales tax and Mrs. Morelock told in plaintiff's presence about making a trip to Jefferson City to correct what she thought was a deficit in that she felt she owed a little more. Plaintiff replied that it was foolishness, it was a matter of a few cents.

Mrs. Hutchinson heard discussions between Mrs. Morelock and plaintiff about the business in Christian County while they were still in the wholesale business. This was probably the latter part of 1952. Mrs. Morelock's didn't approve of plaintiff's feuding with his neighbors down there and she asked him not to do it. Plaintiff carried a gun which she had seen in the seat of his truck. Mrs. Morelock asked plaintiff why

he carried it. She said to plaintiff: "Treon, you are going to get involved to the extent that the Glenstone Hatchery will be involved in a lawsuit." She also stated, "As long as I am with you in it I don't want that" and, "if you have to feud with them wait until such time that I am not connected with you."

Jo Ellen Beatty, Mr. Walker's secretary, testified that at the Morelock house when the will was read, she heard no protest or objection to the will, but on cross-examination she admitted she did not hear every conversation and did not hear anyone make a statement, "Come in here and read this damn will," or "no woman in her right mind would write a will like that." She said plaintiff asked about a gas heater, if he got that along with the furniture.

Mr. Paul L. Minick said he heard no one complain about or object to the will when he was at the Morelock home following her death. He admitted that he could not recall anything about any of the conversation that took place, that he was there as an appraiser, and that was all he did and all he remembered about it.

Testimony bearing upon plaintiff's performance of the alleged contract was given by various witnesses. We need not detail this testimony. It was to the effect that plaintiff bought groceries, medicines, etc., for Mrs. Morelock; that he took her to and from the hospital; that he waited upon her day and night during the last six weeks of her life; that he washed clothes, did the dishes, ran the sweeper and took care of the chores around the place. Mrs. Oltman, Mrs. Johnson and John Treon all testified that Mrs. Morelock said to them that plaintiff had done everything he could for her and had carried out his agreement to the fullest extent.

 The law which governs this case is well settled. "A plaintiff must prove his case by evidence so clear, cogent and convincing that no reasonable doubt can be entertained." Steere v. Palmer, 359 Mo. 664, 223 S.W.2d 391, 393. As stated in one of the leading cases, Walker v. Bohannan, 243 Mo. 119, 135, 147 S.W. 1024, 1028: "The enforcement of contracts of the character here involved is an exception which courts of equity have ingrafted upon the statute of frauds. The exception is one that is sparingly exercised, and rightfully so. Title to real estate should not slumber in oral contracts to convey. The very conscience of the court must be touched by the facts of the particular case before the exception to the statute will be called into play."

Before discussing other evidence in this case, it would be well to consider that evidence which sheds light upon the type of woman Mrs. Morelock was. It is a most natural inquiry as to what type woman she was, since she is charged with having breached an alleged contractual obligation to plaintiff. One of the witnesses testified that plaintiff himself had stated repeatedly that Mrs. Morelock was a good business woman and had it not been for her he would not have had what he did have. On another occasion plaintiff is quoted as having stated: "Well, all I have I owe to the Morelocks." John Treon, plaintiff's son, testified that Mrs. Morelock "was a very good woman." Mrs. Oltman admitted that Mrs. Morelock "was a pretty good business woman."

When Mrs. Morelock and plaintiff were in business together they disagreed on how much income to turn in for tax purposes; plaintiff always thought she turned in too much. When plaintiff said that if he had full control he would not turn it in, Mrs. Morelock replied; "As long as I'm in the partnership with you, George, it will be turned in right regardless of how you feel about it." Mrs. Morelock kept careful records and was meticulous in wanting all records kept on a businesslike basis. She insisted that plaintiff turn in an invoice for every sale. Sometimes she didn't think he brought them all in. She thought that plaintiff spent too much in connection with the operations of the business. On one

occasion Mrs. Morelock made a trip to Jefferson City to correct what she thought was a deficit in that she felt that there was owed a little more taxes. There was also testimony on the part of one of plaintiff's witnesses that Mrs. Morelock was in Burge Hospital in August 1956, and that Mrs. Morelock then kept, as she always did, careful records of X-ray treatments and hospital expenses. She even kept records as to her medicine, what hours she took it or was to take it, and she also was very careful to take her medicine just as the doctor prescribed it. Mrs. Morelock always paid her bills promptly by check and she did this even within the last two weeks of her life, as long as she was able to write. She was very prompt about the payment of her obligations.

Another example of how carefully Mrs. Morelock tended to all business transactions is the proposed draft of her last will, written by her in pencil, and the itemized list of proposed bequests and personal property assets which she delivered to her attorney, Wayne Walker. These were prepared by Mrs. Morelock before she called Mr. Walker about writing her will. All of the evidence pointed to the fact that Mrs. Morelock was punctilious in keeping careful records of her business and personal transactions. Wouldn't it have been strange for such an honest and careful business woman to make an oral contract to devise real estate which comprised the most valuable part of her property? Mrs. Morelock's scrupulous regard for her obligations, her adherence to businesslike methods and her reputation for being an honest woman, are all facts to be considered in this case. As stated by this court in Feste v. Bartlett, 269 S.W.2d 609, loc. cit. 614, 615: "Abraham's shown integrity is a fact we may consider in determining whether Abraham had agreed in July 1946 to bequeath plaintiff $30,000." To the same effect see the case of Westlake v. Westlake, Mo.Sup., 201 S.W.2d 964, 969. To say the least, it would hardly be in harmony with either Mrs. Morelock's character or her business

habits for her to have left an important matter such as the disposition of valuable property to the uncertainties of an oral contract. In this connection it is well to set out the following portion of the trial court's finding:

"The court also notes the fact that Ada L. Morelock was a keen and shrewd business woman who carefully managed her affairs. She looked after her part of the business. She kept careful records of the business and later of her personal affairs. She assisted in the development of the Glenstone Bait Company and she and plaintiff saw the business grow from a shoestring operation to a financially successful enterprise. She was concerned about how the business was operated even when because of her health she could no longer participate in the active management of the business. She was concerned about the taxes and about public opinion with regard to the company. It is true that she made two prior wills in which she bequeathed the Glenstone property to plaintiff yet if she were cognizant of a binding oral contract with plaintiff she failed to mention such fact in either of the first two wills, according to the evidence. If there had been a binding oral contract there surely would have been some mention of it in the two prior wills. * * * The court cannot believe that she would overlook such an important matter when she was so careful to execute a gift tax form giving plaintiff her interest in the Glenstone Bait Company and Glenstone Hatchery in March of 1954 which business the plaintiff later sold at a substantial profit to himself.

"In her third will executed on July 31, 1956, the deceased refers to George Treon as 'my *former* business associate' and after giving him the sum of $1,000 in her will she stated: 'I *have heretofore* given to my business associate all of my interest in the Glenstone Bait Hatchery.' This tends to prove to this court at least that if she had an oral contract to convey the Glenstone property to plaintiff she was not aware of it and there is nothing in this record to

suggest that she was incompetent or of unsound mind at the time of the making of the Third Will. Defendants' Exhibit 2 is in the handwriting of Ada L. Morelock where she sets out just how she wants to dispose of her property. The court doesn't believe she would overlook an oral contract with plaintiff if there had been one."

And it appears to us that certain conduct on the part of the plaintiff is wholly inconsistent with the asserted oral contract. Mrs. Oltman, who, as the trial court noted, was a "very willing witness for the plaintiff," was his "main witness." However, even she admitted on cross-examination that plaintiff had threatened to file suit on the ground that he was Mrs. Morelock's common-law husband. When plaintiff went to see Mr. Walker two or three weeks after the probate of Mrs. Morelock's will, plaintiff said he was going to "bust the will." When asked on what ground, plaintiff replied: "Well, you may not know it but I was her common-law husband." When told by Mr. Walker that there was no such thing as a common-law husband in Missouri, plaintiff then said something to the effect that Mrs. Morelock wasn't capable of making a will. When advised that he was not an heir and had no legal capacity to contest the will, plaintiff then said he could file a claim for the services he had performed in caring for her during the last six weeks of Mrs. Morelock's life.

It is inconceivable that a man who had an oral contract with a deceased woman for the devise of real estate would claim to be her common-law husband and threaten to sue on that ground if, in fact, there had been such an agreement as alleged in this case. If there had been such an agreement would not that have been the first, *if not the only*, thing he would have discussed in connection with breaking the will?

Singularly enough, not one word was said by plaintiff to Mr. Walker about any contract or agreement between himself and Mrs. Morelock at the time of the discussion in Mr. Walker's office or at any other time. Although Mr. Walker had represented Mrs. Morelock since 1935, and had drawn her last will, as well as previous wills, at no time had she ever mentioned to him any contract or agreement between herself and plaintiff regarding the disposition of her property on Glenstone. There is no reason to disbelieve the testimony of defendant Walker, as was noted by the trial court, and it would seem incredible that Mrs. Morelock, being the careful business woman that she was, would never have discussed such an important matter of business with the attorney who had represented her for so many years, if there had been any such contract as plaintiff seeks to establish. And the testimony of Mrs. Hutchinson is very significant. As we have stated, she lived immediately south of Mrs. Morelock for more than ten years and saw her practically every day. She heard a number of business discussions between Mrs. Morelock and plaintiff, but she never heard either Mrs. Morelock or plaintiff ever say anything about any agreement or contract regarding the devise of the Glenstone property.

Plaintiff places much emphasis upon his alleged performance of the purported oral contract. Whatever plaintiff may have done for Mrs. Morelock was naturally referable to the relationship of many years between plaintiff and the Morelocks and what the Morelocks, particularly Mrs. Morelock, did for plaintiff. By plaintiff's own admission, "Well, all I have I owe to the Morelocks," he showed that he recognized some sense of obligation to them. Again plaintiff is quoted as having said repeatedly "that she (Mrs. Morelock) was a good business woman and if it hadn't been for her that he wouldn't of had what he did." In addition to the oral evidence in this case, defendants' Exhibits 1 and 2 show conclusively that Mrs. Morelock made a very substantial gift to plaintiff, which he acknowledged as being of the approximate value of $16,500, as of December 31, 1953, the date of the gift. That the value of this

gift at that time was probably underestimated appears from the fact that in 1956 plaintiff sold the hatchery for either $65,000 or $70,000.

We agree with the trial judge that "this cause was well tried." And it has been ably argued and briefed in this court. As is to be seen, the evidence was in sharp conflict. The trial judge had the witnesses before him with the opportunity to see and hear them, and thus was in a much better position to judge their credibility and the weight and value to be given their testimony than is this court. In our opinion, under the evidence in this case, and with due deference to the finding of the trial court, the judgment should be affirmed. It is so ordered.

LEEDY, P. J., and EAGER and STORCKMAN, JJ., concur.

JAMES W. BROADDUS, Judge, Kansas City Court of Appeals, sitting as Special Judge by transfer order.