**FESTE v. BARTLETT.**

No. 43777.

Supreme Court of Missouri.

Division No. 1.

June 14, 1954.

Motion for Rehearing or to Transfer to Court en Banc Denied July 12, 1954.

Richard S. Bull, St. Louis, Carter, Bull & Baer, St. Louis, of counsel, for defendant-appellant.

Adolph Kirchner, Roy H. Bergmann, Roy W. Bergmann, St. Louis, for respondent.

VAN OSDOL, Commissioner.

This is an appeal from a judgment for plaintiff rendered in an action against the executor of the will of Abraham G. Minner, who died October 15, 1950.

The action was instituted October 16, 1951, for damages in the sum of $30,000, or for the specific performance of a promise or agreement of deceased alleged by plaintiff to have been as follows,

"In the early part of 1946, after plaintiff and said Abraham G. Minner had been keeping company with each other for sometime, he requested her to relinquish any ideas of marriage with any other person except him, to refrain from having social engagements with any other gentleman except him, and to devote exclusively to him all of her time available for social engagements.

"Said Abraham G. Minner informed plaintiff on said occasion that it was his intent and desire to marry plaintiff when circumstances would permit, but that there were certain undisclosed circumstances which prevented him from entering into marriage at that time, that he would marry plaintiff when those circumstances no longer existed, and that he would in any event promptly execute a will bequeathing plaintiff $30,000 if she would devote her free time exclusively to him.

"Plaintiff acceded to said request of said Abraham G. Minner and did not thereafter have any social engagements with any other gentleman, she relinquished the prospect of marriage with any person other than said Abraham G. Minner, and devoted all of her free time exclusively to him thereafter continuously until his death.

"During said entire period of time plaintiff devoted herself to the companionship of said Abraham G. Minner, consoled and encouraged him in his periods of melancholy and spiritual depression, counselled with him in his personal affairs, continuously performed for him such personal services as mending his clothes, doing his laundry, assisting him in the selection of his wearing apparel, and countless other services of similar nature.

"Said Abraham G. Minner did not marry plaintiff, nor did he bequeath to her the sum of $30,000 as he had promised and agreed."

The trial court decreed specific performance of the contract and ordered the defendant executor to pay over to plaintiff the sum of $30,000 out of the assets of the estate.

Defendant-appellant, executor, herein contends the trial court erred in finding there was a valid contract for a testamentary bequest to plaintiff. In support of the contention, defendant asserts the evidence introduced by plaintiff was insufficient in quality to establish the existence of the contract. Defendant points out that the evidence tending to prove the contract as alleged consisted of the testimony of witnesses related to plaintiff; that the verbal evidence thus introduced was wholly unsupported by documentary evidence; and, defendant further asserts, that shown conduct on the part of plaintiff was inconsistent with the contract as alleged and cast doubt on plaintiff's claim.

Plaintiff-respondent contends that she proved all of the essential elements of her case by evidence so unquestionable—so clear, cogent and convincing—that no reasonable doubt could be entertained as to its verity.

Abraham G. Minner was born in Russia. He was Jewish. Having come to America, he located in Milwaukee and became a naturalized citizen. He had been twice married, and both of his wives had died. The second wife died in 1945. He and his first wife had two children, sons, born to them. One son had died in 1928, and the other was killed while in military service in 1945. Deceased was sixty years old when he met plaintiff, and she was then about forty-two years of age.

In 1928 Abraham had moved to St. Louis at the suggestion of his brother Samuel G. Minner. Abraham then became the traveling representative of Minner & Company, a corporation, organized by his brothers Samuel G. and Leo G. Minner and another. He was given some shares of stock in the corporation "to get him started." The corporation was engaged in the hide, fur and wool business.

Abraham and his second wife had lived in an apartment at the Forest Park Hotel. After the death of his second wife in 1945 Abraham occupied a small room in the same hotel where he lived until his death in 1950.

For several years, plaintiff, a gentile, had been the manager of a cleaning establishment. She had married in 1928. She was awarded a decree of divorce from her husband in 1943; and later resided at the home of Mr. and Mrs. Harry A. Reader, occupying a room in the Reader apartment on Forest Park Boulevard in St. Louis.

Plaintiff's relatives and friends met Abraham in January 1946 when they were introduced to him by plaintiff. They testified that thereafter they had seen Abraham with plaintiff "two or three times a week", or "at least four or five times a week." The same frequency of these meetings of plaintiff and Minner continued until his death.

Witnesses whose testimony tends to support the oral contract as alleged by plaintiff were plaintiff's two sisters and an aunt.

One of the sisters testified that Abraham and Lela called at the sister's home in July 1946. She said "he (Abraham) was very happy when he came in and so was Lela, beaming all over. I asked them what the occasion was to make them so happy. He told me that Lela had just promised that she would never go out with another man and go with him alone. He, in turn, agreed that he would leave her $30,000." Prior thereto plaintiff had gone out with other men, in fact "she was a very popular girl"; thereafter, plaintiff did not go out with any other man. This witness also said, "I heard him say, on a few occasions, they intended to get married, but he would always sort of say at the time he just couldn't. I didn't pry into his affairs or ask why he couldn't. He just said he couldn't but that some day they intended to. That is as much as I ever heard him say." He gave plaintiff a diamond ring— a solitaire. "I was under the impression it was an engagement ring."

The other sister of plaintiff testified she was present and heard the conversation of July 1946. "He (Abraham) came jumping around like he was dancing. He said, 'I have some good news', and that is what he told me * * * that he had promised

to leave her $30,000 in his will if she wouldn't go out with any other men, because he said he didn't like to go with girls that had boy friends; he wanted some one for companionship. He was very happy about it, because he said he was very lonesome and she had made him very happy by going with him and promising him she wouldn't go with any other man, which she didn't do."

The sister further testified that Abraham "was always telling me how crazy he was about her (Lela), how happy she had made him since he had met her. He said, 'Some day she is going to be left a wealthy woman.' * * * he always talked about it every time I saw the man. * * * He called her 'My baby.'" He said that she could invest the $30,000 in some stock and she would get $150 a month. It would help take care of her the rest of her life. Abraham had a bad leg. He would take off his shoes and lie down for awhile. Occasionally Lela would massage his leg. Sometimes plaintiff would go to the kitchen and fix Abraham something to eat because he didn't like everything. She would fix him something he wanted. She would wash his woolen shirts and hose—things which could not be safely sent to a commercial laundry. She waited on him— always asked him if he felt better or if he wanted something, "and that is the things I saw her do at my home."

The witness also said she had heard Abraham say that he and plaintiff were going to be married. He said this several times—"in fact they were waiting for this apartment (the Montclair) to be built * * *." (The apartment building was finished after Abraham's death.)

Plaintiff's aunt testified that Abraham was always saying Lela was going to be a rich woman some day. She would have plenty. The witness said, "He was very affectionate." He said, "'I have promised Lela $30,000 if she would be a true companion to me.'" He said, "'I am going to leave her in my will $30,000, because,' he said, 'his sisters and brothers doesn't need it.'" Abraham and Lela often

visited the home of the witness. He sometimes took the witness out to dinner. He called her "Aunt Ida." Abraham would lie "down on my couch and take off his shoes, because he wasn't well. * * * She (Lela) would have to give him some medicine, get him aspirins or she would have to get a hot pad and put it on his leg."

Ida (Mrs. Harry A.) Reader, at whose apartment plaintiff lived, testified of Abraham's visits to her home. Abraham always addressed Lela in endearing terms. He would call her "dear or honey or darling; baby sometimes." He said that Lela would never be sorry that she spent her time with him because he was going to take care of her. In fact he used the terms "providing", "taking care of", and "wealthy." At one time he mentioned $30,000 that he had provided for her in his will. In fact he even mentioned the name of his attorney. He had "seen his lawyer and had taken care of Lela." He said he and Lela had had an understanding. That at that particular time he couldn't get married but he would marry her later. He mentioned getting an apartment in an apartment building as soon as it was completed. The witness spoke of the diamond ring, and of Abraham's photograph (taken in his youth) which he had given Lela. Abraham said the ring "was an engagement ring." The photograph "appeared after the ring." The ring would probably retail for a thousand dollars, or twelve hundred dollars with tax, "but I know it was wholesale. * * * He said he had gotten it from a friend at a price." The witness testified of the many calls Abraham made in person and by telephone, and of the exchange of many letters between Abraham and Lela when Abraham was out of the city on business.

Another friend of plaintiff, a very close friend of Ida Reader, testified of Abraham's affection for Lela. "He would tell her how much he thought of her; how much in love he was with her. And then one day when I went in—we lived close to where she worked. I got there quite often. One day I went in and she said,

'Look what I got!' She had this diamond ring. * * * She wore it on her engagement finger." Abraham said, "'I certainly will see that Lela is always taken care of.'" But he "didn't mention any amount or anything like that. I never asked him." Abraham did not mention to the witness that he had made a contract with Lela, except that he did say at one time, "I think at Mrs. Reader's, we were all talking about the new apartment house over there, the Montclair. At one time he did say to both of us that as soon as they were finished he was going to put in for one; that he and Lela were going to take one of their apartments; that they were going to be married."

Photographs were introduced into evidence showing Abraham in plaintiff's company, alone and with others. Several Christmas and birthday cards from Abraham to Lela were also introduced. One, "A Christmas Message for You, Darling", with sentimental verse in printed form, was signed "Abe." A birthday card, "Happy Birthday, Sweetheart", was signed "With Love Abe." Another, entitled "Christmas Greetings", was signed "From Your Sweetheart Abe." Another sentimental verse in printed form was entitled "For My Sweetheart's Birthday With Love", and signed "Abe." No letters from Abraham to Lela were offered in evidence.

While Abraham and Lela were having dinner at a restaurant in East St. Louis, October 15, 1950, Abraham was stricken with a heart attack and died. Plaintiff Lela at once called the home of Abraham's brother Leo. Abraham's body was taken first to a hospital and thence to an undertaking establishment. An inquest was held the next day.

Defendant introduced evidence tending to show that Abraham's relatives had not heard of plaintiff prior to Abraham's death. The defendant executor, an attorney for Minner & Company and attorney and friend of Abraham, had never heard of plaintiff until process was issued and served upon him in the instant action. The relatives testified of the frequency of Abra-

ham's visits to their homes, and of his several statements that he did not intend to again marry. They also told of his business trips as the traveling representative of Minner & Company. They said he was out of the city about one third of the time during the years until his death in 1950. Witnesses, guests and members of the staff of the Forest Park Hotel, testified of Abraham's frequent practice of visiting with other guests in the lobby of the hotel in the evening. This, they said, occurred three or four nights a week. It seems that on one evening a week, when in the city, Abraham engaged in a card game with friends at the hotel.

A rabbi testified that Abraham had been a member of his congregation for about twenty years. Abraham's reputation for integrity was good. Abraham was very faithful in his attendance at the temple unless he was out of town. "I would see him every Friday night; sometimes even on Saturday morning. That is when we hold our services." The rabbi was with him in his three great griefs—the loss of his first wife, the loss of his son, and then the loss of his second wife. Abraham had an orthodox background. With respect to marriage of "Jewish people with non-Jewish people" the witness said, "it is a question of maintaining our identity as a minority people. Intermarriage is not, certainly not encouraged and it is, in many cases, in the orthodox faith, entirely denounced or not countenanced." This policy admits of exceptions, it seems. One of defendant's witnesses spoke of an exception in the Minner family.

Abraham's brother Leo accompanied plaintiff to the inquest October 16th, and took her home after the inquest. He testified plaintiff told him "that my brother was a nice man and that he promised her he would give her $500 or loan her $500 for the purpose of buying stock as an investment. * * * (She) then said my brother promised to get her an electric blanket and she stated that he had one * * * said he had quite a little clothes * * * told me she had a brother that the clothes would fit. * * *" Leo went to the Forest Park Hotel the following day and "picked out certain personal things, and the balance of the clothes, shoes and shirts, underwear, socks, hats and overcoats was left in the room." The witness said he advised plaintiff and the management of the hotel that the articles were relinquished to plaintiff—"I know she got them."

In 1946, when Abraham is alleged to have entered into the verbal contract with plaintiff, he was possessed of property including his shares of stock in Minner & Company, in total value a little in excess of $13,000. He also had two "ordinary life" insurance policies, each for $5,000. Abraham's shares in Minner & Company were and until his death continued to be subject to an insurance · trust agreement under the terms of which, upon Abraham's death, the trustee was to receive the proceeds of other insurance and pay the book value of the shares over to Abraham's estate.

In 1950, Abraham, as a legatee in the will of his brother Samuel who died in January 1949, received cash and shares of stock of Minner & Company of value approximately $37,000; and, at the time of the last settlement filed by Abraham's executor, Abraham's net estate amounted to almost $46,000, exclusive of two $5,000 life insurance policies which were payable to certain relatives as beneficiaries.

The brother Leo, and Leo's son Jack, were the principal legatees named in Abraham's will executed February 18, 1949.

 A court of equity will specifically enforce an oral contract to make a will in a particular manner, where a valuable consideration has been received for the promise and fraud would be perpetrated on the promisee or beneficiary unless the contract be performed. But the proof of the contract must be so clear, cogent and convincing as to leave no reasonable doubt in the mind of the chancellor as to the contract and its terms; and where the consideration consists of acts to be performed, there must be like proof that the acts per-

formed refer to and result from the contract, and are such as would not have been performed except for the contract and with the view of its performance. There must be no equivocation or uncertainty in the case. Wallace v. Shanks, Mo.Sup., 221 S.W.2d 873; Feiden v. Gibson, Mo.Sup., 218 S.W.2d 105, and cases therein cited; Kinney v. Murray, 170 Mo. 674, 71 S.W. 197.

◼ In the instant case the trial court expressly found that defendant's decedent, Abraham G. Minner, had entered into the agreement with plaintiff as alleged; that plaintiff had fully performed; and that manifest fraud would be worked upon plaintiff if she were denied the fulfillment of the contract. However, upon appeal of this case tried and decided below as in equity, we try the case anew. We review the entire record and determine the value and weight of the evidence. We reach our own conclusions, deferring, where proper, to the findings of the trial chancellor.

◼ The evidence introduced by plaintiff tending to establish the oral contract as pleaded and its performance on the part of plaintiff consisted of the testimony of plaintiff's relatives and friends, none of them having an actual pecuniary interest in the outcome of this litigation. But, of course, we realize that the relationship of a witness to a party may be considered in evaluating the testimony of the witness. And in our reading of the record we have also become aware of the tendency of plaintiff's witnesses to repetitiously emphasize facts which they seemed to consider as having import in establishing plaintiff's claim.

There is little reason to doubt that Abraham G. Minner was often in plaintiff's company; that he often had social engagements with her alone, and in the company of her relatives and friends. No doubt he enjoyed her companionship and greatly admired her. He also seems to have frequently taken Lela and her relatives and friends out to dinner, provided them with tickets to the opera, and endeavored in many other small ways to show his appreciation of her companionship and of his social contacts with her relatives and friends. This admiration and affection of Abraham for plaintiff seems to have so grown that he addressed her in terms of endearment, and made public display of his affectionate regard for her. In fact the testimony of plaintiff's witnesses tends to show that Abraham was pursuing an ardent courtship, somewhat extraordinary for a man of his years.

Plaintiff's witnesses testified of Abraham's statements of intention to marry plaintiff, of his presentation of an engagement ring, and of his statements that as soon as certain apartments were finished he was going to put in for one—that he and plaintiff were going to take one—that they were going to be married. It may be that he was reluctant for a time to again contract a marriage after his unfortunate experiences in the loss of his two former companions, and it may be that he was gravely considering whether he, at his age, should remarry and especially whether he should marry a woman much younger than he and of another race and creed. And it may be that plaintiff was also reluctant to marry a man much older than she, and of another race and creed. Nevertheless, there was ample evidence introduced by plaintiff to justify the conclusion that Abraham and plaintiff were engaged to be married. If Abraham had promised to marry plaintiff, as plaintiff's evidence tends to show, yet it could not be said that Abraham breached his promise to marry. And, if Abraham was courting and had promised to marry plaintiff, then the plaintiff's devotion of her free time exclusively to him, and her courtesies to him could be reasonably considered to have been referable to the courtship and engagement to marry.

◼ The rabbi testified that Abraham had a good reputation for integrity, and we have read the testimony of several disinterested witnesses who had had contacts with Abraham socially and in business and who in their testimony unwittingly revealed their respect for him. Abraham's shown integrity is a fact we may con-

sider in determining whether Abraham had agreed in July 1946 to bequeath plaintiff $30,000. Stillman v. Austin, Mo.Sup., 148 S.W.2d 573; Westlake v. Westlake, Mo. Sup., 201 S.W.2d 964. The sum of $30,000 was much in excess of all of his wealth in July 1946; and at that time, so far as the evidence shows, he had no apparent prospect of acquiring additional property which would justify such a commitment. It is unusual for a man of integrity to promise to do what he has no real reason to believe he can do. This alleged promise, in such circumstances, is one incongruous thing. It does not reasonably fit into the pattern of the evidence as disclosed by the whole record.

We have also considered the testimony that no one of the Minner family had ever been advised, nor had defendant executor been advised, of any claim on the part of plaintiff that she felt that Abraham had become obliged to will her $30,000, until this action was instituted at a time almost a year after the executor was granted his letters testamentary.

In conclusion we also refer to another circumstance. It is true that Abraham's brother, Leo, has a real pecuniary interest in the outcome of this case, but if his testimony of plaintiff's conversation with him, as they were leaving the inquest, is true, then this conduct of plaintiff, described by Leo, also raises a grave doubt as to the merits of her case. If Leo's testimony was true, it is strange that plaintiff was concerned about clothing for her brother and then made no claim such as she now asserts. White v. Cochran, Mo. Sup., 248 S.W.2d 854. It is not enough for plaintiff to say that she could not have testified and denied that she had had the conversation. We think it is significant that she made no effort to show by the testimony of others that she did not receive the articles which Leo said were relinquished to her pursuant to the conversation he said she had with him.

Taking into account and weighing all of the evidence disclosed in the whole record, and having in mind the weight of the evidence which we think is in conflict with the parol testimony tending to support an oral contract as alleged, we are of the opinion that, in this case, a court of equity should not exercise its power to, in effect, set up such parol testimony on a par with the writing which statute plainly requires when one intends to make testamentary disposition of his property. Section 468.150 RSMo 1949, V.A.M.S.

The judgment should be reversed.

It is so ordered.

LOZIER and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.