**Florence E. SCHERTZ, Plaintiff-Appellant,**

v.

**Meyer BLOCHER, Executor of the Estate of Morris Barnholtz, Deceased, et al., Defendants-Respondents.**

No. 29213.

St. Louis Court of Appeals. Missouri.

March 20, 1956.

Boggiano & Hessel, Meyer Hessel, St. Louis, for appellant.

Kerth, Thies & Schreiber, Dalton W. Schreiber, Clayton, for respondents.

SAM C. BLAIR, Special Judge.

This is a suit by plaintiff, Florence E. Schertz, against the executor and heirs of Morris Barnholtz, deceased, for specific performance of an alleged oral contract whereby she claims Barnholtz agreed to bequeath his entire estate to her in return for personal services she says she rendered him during his lifetime.

This is the substance of the petition: Plaintiff was a niece of Morris Barnholtz by marriage. Barnholtz became ill in 1950 and for six months thereafter it was necessary for him to spend all of his time in bed. During that period, and for the rest of his life, he required nursing and other personal care. Plaintiff agreed to prepare his meals, to nurse him, and to perform other necessary personal services for him as long as his condition rendered this necessary. In return, Barnholtz agreed to bequeath to plaintiff by will all of his estate. Plaintiff duly performed her agreement, nursed the deceased, prepared his meals, and, from the date of the agreement until his death, rendered him all other necessary personal services. Deceased failed to bequeath all of his estate to the plaintiff. Instead, he bequeathed only one twelfth to her and bequeathed the residue in various fractions to six of his other relatives. The answer generally denied the contract and its performance and prayed the court to deny specific performance.

The trial court found the issues against the plaintiff and for the executor and heirs and entered its decree accordingly. The plaintiff appeals to this court for a reversal of this decree and for a decree compelling specific performance as prayed. The controversy involves only personalty and the amount in dispute is less than $7,500. We have jurisdiction. The single question for determination is whether plaintiff established the averments of her petition by that measure of proof which the law requires in these cases.

The testimony plaintiff adduced to establish her case was as follows: Dr. M. Norman Orgel testified that for several years prior to June 26, 1950, Barnholtz came to his office once a week as a patient, sometimes alone, frequently with Mrs. Schertz. He was afflicted with Parkinson's disease and inactive tuberculosis. On that date, he advised Barnholtz and Mrs. Schertz that a recent test had disclosed that the inactive tuberculosis had become active and was contagious. He prescribed either sanitarium care or bed rest at home. Barnholtz and Mrs. Schertz agreed he should stay at home. Direction was given them to boil all dishes. Arrangements were made for a visiting nurse to make periodic visits. Barnholtz was ordered "confined to the house, except for office visits, for the first six months." He was allowed to get up for meals and to go to the bathroom. The doctor said, "Of course, if you know Mr. Barnholtz, it is pretty difficult to get bed rest." Mrs. Schertz frequently came to his office with Barn-

holtz. "Mrs. Schertz and Mr. Barnholtz would sit down, and Mrs. Schertz would explain what difficulty she had with Mr. Barnholtz; one, he would not stay in bed; two, he would not stay in the house when he could go out; * * * and he just wouldn't obey the rules." There is no evidence that his illness ever required the doctor to visit Barnholtz in the home. There is none that Mrs. Schertz ever told the doctor thereafter that Barnholtz at any time became helpless or lost control of any of his functions. Barnholtz died June 9, 1952, of Parkinson's disease with tuberculosis contributing.

Marian Reisch, St. Louis County Health Department nurse, visited the home three times a week during August 1950, and administered streptomycin to Barnholtz for his tuberculosis. He was not always in bed. Sometimes he was dressed, but usually he was in pajamas. He seemed somewhat underweight and pale, he coughed very little, but tired easily. He appeared to have "all tubercular symptoms that a tuberculosis patient has." Mrs. Schertz was "taking care of him insofar as she would have to keep his dishes separate and * * * cook his meals when he was there." He was visiting Dr. Orgel at regular intervals. There was no evidence that Mrs. Schertz or Barnholtz ever told her that Barnholtz was helpless or had lost control of any of his functions.

Joseph L. Schertz, Jr., plaintiff's son, 31 years of age, had known Barnholtz as long as he could remember. He visited in the home frequently during Barnholtz's illness and stayed an hour or two. In June and July, 1950, he had dinner in the home almost every night. Barnholtz was "going around with his pajamas and slippers and robe on and lying in bed or sitting around in a chair." "My picture of him is shuffling around in his pajamas." He walked "slowly and shakily." Usually he would get up for his meals, but at times they were served to him in bed. Mrs. Schertz cut his food for him and she boiled his dishes after each meal. Occasionally Barnholtz would express to him his gratitude "about the way she was taking care of him," and

say "he did not know what he would do if it wasn't for her looking after him." Barnholtz "was in the habit of going out on weekends." He also went to the doctor's office. Schertz did not testify that Barnholtz ever mentioned to him any contract with his mother.

Bertha Bernstein, a practical nurse, knew Mrs. Schertz casually for 25–30 years and had been "a good friend" of Barnholtz for 35 years. In August or September, 1950, Barnholtz phoned and asked her to visit him. He told her he had "Tb, that was inactive for a long time and had now flared up." Between August or September and Christmas she visited him twice more in the home and sat and talked with him in his own room. On one occasion, he asked her to assist him to the bathroom, and enroute he was "incontinent." "I helped clean him up." She remained for dinner. He came to the table for dinner. She helped him cut his food. On these visits she found him lying in bed in his pajamas and a robe. "Q. You don't know what services Mrs. Schertz rendered for Mr. Barnholtz? A. * * * I know dishes were being boiled.

"Q. You don't know whether or not he was able to bathe himself? A. No, sir. * * * I don't know.

"Q. Or shave himself? A. No, sir." He "always expressed how good she (Mrs. Schertz) was to him; and he didn't know what he would do without her; she was better than his mother." "Q. Did he ever say anything about paying her for services? A. He told me time and time again, in his slow manner,—he talked very slow,— that whatever he had would be hers, because he couldn't forget her kindnesses; that his relatives didn't want to put up with him * * * I think I only visited two or three times." During December 1950, she met him on a streetcar. He was going down town. The witness did not testify that Barnholtz ever mentioned to her any contract with Mrs. Schertz.

Edward W. Uhri testified he had known Barnholtz for 21 years and had been a "close friend" of Mrs. Schertz for the

same period. He visited in their home almost every day. Prior to the death of Barnholtz's wife, Mrs. Schertz had lived with Mr. and Mrs. Barnholtz at various times. Following Mrs. Barnholtz's death, Barnholtz and she lived at 3617A Wilmington, St. Louis, for about two years. Each paid one half of the rent and all other expenses. Mrs. Schertz "handled the house for him." In 1950, Barnholtz fell at the Fox Theater and injured himself superficially. Dr. Orgel gave him "a thorough examination." Shortly afterward Barnholtz told Uhri in the home: "'the doctor gave me some bad news.' 'He tells me that I have bad lungs, and I have tuberculosis.' 'I don't know what I'm going to do, for the simple reason I am alone, as you know, and the only one that has done anything for me is Mousie (Mrs. Schertz). And I talked to Mousie * * * and asked her whether she would agree to take care of me for the rest of my life, in return for which I would leave her everything that I have, regardless of how much or how little it was.'" He said Dr. Orgel told him if he stayed in bed for three months and had good care and rested, he thought he might be able to pull him out. He did stay in bed "most of the time," "almost constantly," except when he got up to go to meals and to the bathroom. Mrs. Schertz prepared his meals and always boiled his dishes. "He was able to * * * shave himself with an effort, and he could do those things which afterward he couldn't do any longer." Uhri testified Barnholtz remained in bed at 3617A Wilmington during June and July, 1950. The witness errs in stating Barnholtz was in bed during all of June 1950, for Dr. Orgel did not prescribe bed rest for him until June 26th. On August 1, 1950, Mrs. Schertz and he moved from 3617A Wilmington to an apartment at 7256 Pershing which Mrs. Schertz had purchased. There he remained in bed during August, September, and October, 1950. He had a private room and bath. At the Pershing address he paid her $50 per month rent and paid for one half of the food. During the five months Dr. Orgel ordered him to remain in bed, Mrs. Schertz took him to the doctor every two weeks. One Sunday Uhri saw her in the basement of the Pershing address washing bed clothing she said Barnholtz had soiled after becoming ill during the previous night. Uhri had noticed her doing this "several times before." Moreover, "on several occasions" Barnholtz had lost control of his bowels enroute to the bathroom. "On several occasions" he fell in the bathroom. On the Sunday Uhri found Mrs. Schertz washing bedclothes, he went up to the kitchen of the apartment and saw a one hundred dollar bill lying on the table. "Mrs. Schertz and I went into Mr. Barnholtz's bedroom together; and in my presence Mrs. Schertz said to Mr. Barnholtz: 'Saph, I am returning this hundred dollar bill to you, because I want you to keep your money; make it last as long as you possibly can. You don't know how long you are going to live, and I don't want anything now. We have our agreement. Meanwhile, I don't want any gratuity for what I am doing.'" Barnholtz then asked her to keep the money but she refused. After five months' bed rest, he began to "perk up" and to leave the house on Fridays, Saturdays, and Sundays. Occasionally Mr. and Mrs. Sam Pearline would take him out to dinner. On Fridays and Saturdays he would go across the Mississippi River and gamble. On Sundays Mrs. Bessie Cohen, his first cousin, "would pick him up and take him out" to a "gambling joint on Olive Street Road." "He would lay in bed all week, and Mrs. Schertz would cook for him all three meals, and outside of getting out of bed to go to the dining room for his meals, and sitting in a chair and reading, that is all he did. He never left the house, so he could be strong enough, as he told me, to go out over the week end." "Friday about noon he would get started." "His entire life was gambling, and that is the only thing he lived for, and he would make a superhuman effort to go across the River and attend card and dice games over there." Because of the Parkinson's disease he "had poor control of his hands" and Mrs. Schertz would lace his shoes. "Many times I buttoned his shirt for him," "put in his cuff links," and "tied his tie." "Then he would get on the car, or get a cab" and go alone

across the river. "He would stay out many times until midnight." Twice when he returned it was necessary for Mrs. Schertz to help him up the stairs to the second floor because the Parkinson's disease caused his legs to "give away." When Mrs. Cohen took him on Sundays to the Olive Street resort, she would leave when she had played her cards and Barnholtz would stay later. Then he would call a cab or persuade the resort owner to take him home. Uhri cautioned him that it was unwise for him to remain out so late and alone, but failed to dissuade him. The last time he tried to go across the river to gamble was the Friday before he died. The day before he died he said to Uhri, "'I wish you would come over tomorrrow morning and take me down to my safe deposit at the bank.'" "He never had a bank account." "He said, 'I want to take all my money out of my safe deposit box, and take it out to Clayton and put it in Mousie's account out there, because I realize what a condition I am in, and if anything happened to me, and there wasn't any money available, I don't know what I would do.' I said, 'Saph, I think that is the smart thing for you to do, because Mousie can't afford—if you do live a number of years longer, and your money is tied up, Mousie can't put out her money for your care.' He said, 'I realize that.'" "Q. Did he say why he was putting his money in Mousie's name? A. Yes, she was the only one that had ever done anything for him. * * * He said that, he said, 'she is the only other one that has my interest at heart. The others don't care whether I live or die.' And he said, 'If it wasn't for Mousie I would have been out in the street a long time ago.'" He died the next day and the money was not transferred.

The testimony defendants adduced was as follows: Meyer Blocher testified he was Barnholtz's attorney and had known him "twenty years or better." He "handled quite a few matters for him" and wrote his last will. Barnholtz came to the office "every two months or so" and until "a couple of months prior to his death", and never said anything to Blocher about any other will.

Sam Pearline, husband of Rose Pearline, Barnholtz's niece, testified that he and his wife visited Barnholtz when he lived on Wilmington and on Pershing. He never found Barnholtz in bed. He was usually dressed, many times in a shirt and slacks, listening to the ball game or to some other program. Pearline found him sitting in a chair in his pajamas and bathrobe only once or twice. These visits occurred once a month or every six weeks. Pearline and his wife sometimes took him out to meals and to their home. Two weeks before he died they took him to the Congress Hotel for dinner. He waited downstairs at the apartment for them and he walked over to the car. After dinner they took a ride and then took him home. This visit lasted 3 or 3½ hours. It was never necessary to help him with his food or to cut his meat. Pearline and his wife were at his home the day he returned from the hospital. He did not tell Pearline that he had active tuberculosis or that he would have to spend several months in bed and require assistance. He was wearing a bathrobe and sitting in a chair. About a year before his death, he did tell Pearline that he had lung trouble, "a little dry spot on the lung." Pearline did not know he had Parkinson's disease until shortly before his death. "I just figured the man was getting around 70, and getting a little older, and a little slower, that is all." He knew he was seeing Dr. Orgel every two weeks. On two occasions in the Pershing Avenue home Mrs. Schertz complained to him that Barnholtz stayed out late, "and she says to us: 'When Uncle Morris becomes real sick that he will not be able to take care of himself, you can have him'; or 'I wouldn't be able * * * I wouldn't take care of him.'"

Mrs. Rose Pearline, wife of Sam Pearline and niece of Barnholtz, corroborated her husband's testimony in all respects and added that Mrs. Schertz never told her that Barnholtz had tuberculosis and had to stay in bed and required assistance. On

her visits to the home he was never in bed and, while he did not look exactly hale and hearty, "he was able to take care of himself." She further stated that each time she visited the home Mrs. Schertz "would impress on me when he was in condition that he could not take care of himself that she would not take care of him. She said this each time I went over to their home."

A. L. Barnholtz, Denver, Colorado, brother of Barnholtz, testified he and his wife visited Barnholtz in his homes in June of 1947, 1948, 1949, and 1951. Mrs. Schertz began living in the home at 3617A Wilmington about 1949. Later he learned from her letters that she had purchased an apartment at 7256 Pershing and that Barnholtz and she were living there. In 1950, through her letters, he learned of Barnholtz's illness. "She first wrote me that he had a severe cold and was confined to his room. Later it seems that the cold (was) not leaving him, the doctor insisted he stay in the house and not go to East St. Louis, as was his habit. She was preparing his meals for him, all of which she was, of course, paid for by their arrangements." She did not mention nursing care and "never mentioned anything except preparation of meals. I heard from her that he was confined to home and was not permitted to go out as much as he did." She did say he needed "more care than usual." He continued to hear from her twice a month until Barnholtz died. She "did all the corresponding for my brother." "In nearly every letter she complained of the fact that he was not properly taking care of his health, because of leaving home shortly before noon and staying away until the following morning." She never wrote that she had to dress him or had to wash his clothes "any more than usual." "She always took care of his clothes." He and his wife visited in the Pershing Avenue home in June of 1951 for about 3 or 4 days. Barnholtz told him, in Mrs. Schertz's presence, "he paid her $50 a month for the room * * * one half of all the household expenses, including cost of groceries; cost of utilities; all upkeep, cleaning wom-

an and laundress who came in about once a week or so." She "was to prepare all his meals and keep his room clean." At that time "she prepared a very late breakfast, usually between 11:30 and perhaps 12:30." Barnholtz "then would leave for the day and very often didn't return until early the following morning." This was his regular habit, except in very severe weather. She had written that he was never at home so she could prepare an evening meal. In Mrs. Schertz's presence, Barnholtz said he "was working part time in East St. Louis to supplement his social security income so he would have enough additional to meet his expenses at the house." Barnholtz and the witness and his wife invariably ate their dinners out. Generally, but not always, Mrs. Schertz accompanied them. This was true of all of their visits. Barnholtz paid for all outside meals. "Mrs. Cohen (a first cousin) picked him up at his home for quite a time—maybe several years—every Sunday during permissible weather, and he would spend the day * * with her and her family at some nearby resort," and he "invariably spent Friday nights and all the Jewish holidays" in her home. Mrs. Pearline picked him up occasionally and entertained him for the day. In 1951 he went with Barnholtz to the doctor and "got a good report—I mean, he was in pretty good shape." During the 1951 visit, Barnholtz was in "approximately the same condition" as when the witness visited him in 1949. During this visit there definitely was nothing said about any agreement to leave Mrs. Schertz his entire estate. He knew of no illness Barnholtz had except the one in 1950 about which Mrs. Schertz wrote him. "Mrs. Schertz made it very clear to me on many occasions that she would not care for my brother if a time should come when he required any special attention; she said we would have to take him out of her home and place him in a hospital."

Mrs. Helen Barnholtz, wife of A. L. Barnholtz, and sister-in-law of Barnholtz, corroborated her husband's testimony in virtually all respects and contradicted him in none. She stated Mrs. Schertz wrote her

husband and her at least twice after June 1950 that she could not keep Barnholtz in her home if he ever needed any "extra care" because she could not take on that responsibility, and personally told this to her husband "when we were there in June of 1951. I heard it."

Mrs. Bessie Cohen, Barnholtz's first cousin, testified that he visited her every two or three weeks after his wife's death. After Mrs. Schertz and he moved from 3716A Wilmington to 7256 Pershing, Mrs. Cohen took him out twice every week to dine and to play cards. She "didn't miss a day." This went on for "more than three years" until his death. She would pick him up at his home. He would be downstairs waiting, ready to go. There was no period during 1950 that she did not take him to dinner and to a card game twice during the week, except two weeks when she was in Boston. Her sister took him to dine and play cards during those two weeks. Mrs. Cohen took him to play cards the Sunday before he died. He did not tell her that he had tuberculosis although she knew he was visiting his doctor. He did not tell her he was supposed to stay in bed. When she took him out to dine he cut his food himself. From the restaurant, they would then go to a place where cards were played. She would stay until about 11 p. m. He would stay later and alone, playing cards. "If he wanted to stay later, he stayed later, and I went home. * * * He used to stay later lots of times; in fact he used to stay out there until twelve, one, or two." Mrs. Schertz "used to call me and say 'I don't like him to stay out so late.' I would say, 'I am not his boss.'" When he came to visit in her home, he would "come up all the way to the third floor." During the summer of 1950 he went to her grandson's birthday party at her daughter's home. When she visited him at the Pershing address and Mrs. Schertz was not there, "he came down to the door all by himself and let me in." Mrs. Schertz and he lived on the second floor.

All of the detail with which we have recited the testimony is essential, we think, to acquaint those who may consult this ruling with the quality of evidence we hold in judgment. There is no need to analyze here the decisions relied on by the plaintiff. None parallels the record before us and they are of value only for the general rules they reiterate.

█ It is elementary that the proof of an alleged oral contract must, in cases of this nature, be so strong that it leaves no reasonable doubt in the mind of the chancellor that the contract alleged was actually made. Thompson v. St. Louis Union Trust Co., 363 Mo. 667, 673, 253 S.W.2d 116, 120; Steere v. Palmer, 359 Mo. 664, 669, 223 S. W.2d 391, 392; 26 Mo.Dig., Specific Performance, ⊂⊃121(1). Our duty on this appeal is, of course, to review this cause both on the law and the evidence and to reach our own conclusions, always taking into account the superior opportunity of the trial court to judge the credibility of the witnesses. Glauert v. Huning, Mo., 266 S.W.2d 653, 662. On the other hand, we cannot substitute our own conclusions on the evidence and set aside the decree unless we determine that it is clearly erroneous. Section 510,310(d) RSMo 1949, V.A.M.S. Moreover, we cannot decide that it is clearly erroneous unless we are convinced that this record establishes beyond all reasonable doubt that the contract alleged was actually made. Thompson v. St. Louis Union Trust Co. and Steere v. Palmer, supra.

Plaintiff's reliance for proof of the contract itself must rest mainly, if not wholly, on the testimony of Bertha Bernstein and Edward W. Uhri. Standing alone, Miss Bernstein's testimony cannot establish the alleged oral contract. Neither directly nor indirectly did Barnholtz mention any contract to her. All this witness stated was: "He told me time and time again * * * that whatever he had would be hers, because he couldn't forget her kindness." At the very most, this denotes only a mere disposition to reward Mrs. Schertz for her kindness. It is not sufficient to establish a contract between Mrs. Schertz and Barnholtz, made before the kindness was extended, to bequeath his entire estate to her by will. Forrister v. Sullivan, 231 Mo. 345,

374, 132 S.W. 722, 731; Thompson v. St. Louis Union Trust Co., supra, 253 S.W.2d 120. Concededly her testimony in some measure corroborates the testimony of Uhri. But does Uhri's testimony, coupled with hers, and with all of the evidence, exclude all reasonable doubt that the alleged contract was made? We think not.

Uhri's testimony has been recited. His animus is lost by condensation and no mere narration of his testimony can satisfactorily reproduce the attitude and demeanor which characterized him as a witness. At times he answered direct questions so irrelevantly that examining counsel lost the thread of interrogation so much that the original question remained unanswered. Often his testimony carries strong suspicion that it is hearsay and leaves the reader to doubt whether it is hearsay or not. To say he was a willing witness is to euphemize; he was avid. Time after time he evinced anxiety to forward plaintiff's interests. Too often for a disinterested witness, he volunteered information that no quetion had called for, and often it was clearly incompetent. More than once plaintiff's counsel found it necessary to admonish him to confine himself to the question or the court's ruling when he strove to volunteer information he deemed helpful to plaintiff or hurtful to defendants. He undertook to complain that it was difficult to tell the truth when held to the rules of evidence. Once he volunteered an irrelevancy, and, when an objection was made, he told the court, "Your Honor, if you want me to state the facts, I have to state them," and the court told him, "Well, of course, Mr. Uhri, we want you to state the facts, but the court is governed by rules of evidence, *and you can't detail conditions * * * to suit your convenience.*" Thereupon, he immediately sought to volunteer further information, saying, "I understand. May I say this—" and the court, its patience worn, countered, *"You may say nothing except in answer to questions."* Later plaintiff's counsel quite properly instructed him to relate nothing said by Mrs. Schertz and himself out of Barnholtz's presence. He immediately undertook to appeal to the court,

commencing, "Well, your Honor,—". This time the court laid it down flat, *"You can't change the law to suit your idea."* There are 48 pages of his testimony and 23 times he made it necessary for the court to sustain objections to incompetent statements he volunteered or was about to volunteer or for the court or plaintiff's counsel to admonish him that such statements were not permissible.

Most of what we relate took place while plaintiff's counsel, friendly to Uhri, was examining him. On cross-examination, defendants' counsel undertook to develop Uhri's relationship with plaintiff and his interest in her case. At once his attitude turned from avid to obstinate. We will not prolong this opinion with any documented portrayal of the tactics he used in his effort to turn aside the whole series of questions. It is sufficient to relate that he was almost wholly successful. For the net result of the rather lengthy cross-examination on this subject was that he generally contrived to evade revealing what his relationship and interest were by his strategy of diverting the inquiry, disparaging the questions, and usually avoiding any answer to them.

The trial court was entitled to take into account Uhri's attitude and demeanor as a witness, and we must do so. He was no illiterate or ignorant witness. He was a man of experience and intelligence, and the attitude characterizing his testimony was, we think, a conscious one. Certainly the experienced trial judge must have reached the same conclusion and must have decided that his attitude and demeanor seriously diminished the weight and value that might otherwise have been accorded his testimony. We take the same view. Feste v. Bartlett, Mo., 269 S.W.2d 609, 614 [4], 27 Mo.Dig., Trial, ☞382.

This case appears to us as one strongly appealing for application of the rule of deference to the findings of the trial court. There is a considerable body of evidence contradictory of Uhri's testimony and we certainly see *no ground for regarding it as less credible than Uhri's.* There is that

of Mr. and Mrs. Sam Pearline that when they visited with Barnholtz every six weeks or two months "he was able to take care of himself" and required no assistance. There is that of Dr. Orgel, adduced by plaintiff, that Mrs. Schertz told him of her difficulties with Barnholtz and that "one, he would not stay in bed; two, he would not stay in the house when he could go out; * * * and he just wouldn't obey the rules." The inference is strong that she made these statements during the five months' period when bed rest was prescribed, and his conduct was scarcely that of a bedridden, helpless man. There is that of Mrs. Bessie Cohen that Barnholtz did not need assistance and that she took him to dinner and to play cards twice each week for "more than three years" and did so before, during, and after the five months' period of his alleged helplessness. Standing against the weight of Uhri's testimony was the positive testimony of Mr. and Mrs. Sam Pearline and Mr. and Mrs. A. L. Barnholtz that Mrs. Schertz repeatedly stated to them that if Barnholtz should ever be unable to "take care of himself" or need "special attention" or "extra care," some arrangement would have to be made to get him another place to stay for she was in no position to care for him or to take on that responsibility. Weighing Uhri's testimony, and the attitude in which he delivered it, against this body of testimony contradicting him, it over-taxes logic, we think, to argue that this record establishes that the contract alleged was actually made, and made beyond all reasonable doubt.

■ The trial judge stood charged with evaluating Uhri's testimony, and, after observing him, and coupling his testimony with that of the other witnesses, and weighing it all together, he concluded that the whole evidence fell short of establishing the contract in a manner excluding all reasonable doubt. Our own examination of Uhri's testimony, and of the whole record, according due deference to the superior opportunity of the trial judge to assess credibility, leads us to agree. Our agreement does not require declaring that Uhri was mendacious. It is quite enough to say that our study of his testimony, coupled with the whole record, serves to generate in our minds, rather than to exclude, reasonable doubt that the contract was made, and this obviously prevents any ruling that the trial court's decree was clearly erroneous. Consequently, Section 510.310(d) RSMo 1949, V.A.M.S., stands before us as an absolute bar against disturbing the decree, and it must, therefore, be affirmed.

It is so ordered.

M. C. MATTHES, Acting P. J., and FRANKLIN FERRISS, Special Judge, concur.